# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-02-00469-CR

**Kristofer Marsh, Appellant**

**v.**

**The State of Texas, Appellee**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 147TH JUDICIAL DISTRICT NO. 1010659, HONORABLE WILFORD FLOWERS, JUDGE PRESIDING

## O P I N I O N

Appellant Kristofer Marsh appeals his conviction for possession with intent to distribute four grams or more but less than 200 grams of cocaine. *See* Tex. Health & Safety Code Ann. §§ 481.102(3)(D), .112(d) (West 2003). The jury assessed appellant's punishment at imprisonment for sixty-five years.

Appellant asserts that the trial court erred in denying his motion to suppress evidence, in overruling his challenge of a prospective juror, in failing to grant a severance, and in admitting inadmissible evidence at the punishment phase of trial. We will affirm the judgment of conviction, but because of error at the punishment phase of the trial, we will reverse and remand the cause to the trial court for a new trial on punishment only. *See* Tex. Code Crim. Proc. Ann. art. 44.29(b) (West Supp. 2003).

**SEARCH—NO-KNOCK ENTRY**

In his third point of error, appellant asserts that the trial court erred "by denying appellant's motion to suppress evidence because the evidence was discovered after the police made a no-knock, dynamic entry not authorized by the search warrant or information known to the officers." An appellate court reviews a trial court's ruling on a motion to suppress evidence under an abuse of discretion standard. *See Balentine v. State*, 71 S.W.3d 763, 768 (Tex. Crim. App. 2002); *Oles v. State*, 993 S.W.2d 103, 106 (Tex. Crim. App. 1999). Appellate courts give great deference to a trial court's determination of historical fact. *Johnson v. State*, 68 S.W.3d 644, 652 (Tex. Crim. App. 2002); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). When, as here, the trial court does not file findings of fact, we assume the court made implicit findings that support its ruling, so long as those implied findings are supported by the record. *See Maxwell v. State*, 73 S.W.3d 278, 281 (Tex. Crim. App. 2002); *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000). We review de novo mixed questions of law and fact that do not turn on the credibility and demeanor of witnesses. *Johnson*, 68 S.W.3d at 652; *Guzman*, 955 S.W.2d at 89.

The Fourth Amendment to the Constitution protects "[t]he right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. In evaluating the scope of Fourth Amendment rights, we must look to the traditional protections against unreasonable searches and seizures afforded by the common law at the time of the framing of the Constitution. *See Wilson v. Arkansas*, 514 U.S. 927, 931 (1995). Framers of the Fourth Amendment thought that the method of an officer's entry into a dwelling was among the factors to be considered in assessing the reasonableness of a search and seizure. *Id.* at

2

934. However, the Fourth Amendment's flexible requirement of reasonableness should not be read to mandate a rigid rule of announcement that ignores countervailing law enforcement interest. *Id*. The common law principle of announcement was never stated as an inflexible rule requiring announcement under all circumstances. *Id*. The Supreme Court's unanimous opinion said: "We simply hold that although a search or seizure of a dwelling might be constitutionally defective if police officers enter without prior announcement, law enforcement interest may also establish the reasonableness of an unannounced entry." *Id*. at 936. The Supreme Court left "to the lower courts the task of determining the circumstances under which an unannounced entry is reasonable under the Fourth Amendment." *Id*. at 936.

It is the duty of a court confronted with the question to determine whether the facts and circumstances of the particular entry justified dispensing with the knock-and-announce requirement. *Richards v. Wisconsin*, 520 U.S. 385, 394 (1997). In order to justify a "no-knock" entry, the police must have a reasonable suspicion that knocking and announcing their presence under the particular circumstances would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence. *Id*. This standard—as opposed to a probable cause requirement—strikes the appropriate balance between the legitimate law enforcement concerns at issue in the execution of search warrants and the individual privacy interests affected by no-knock entries. *Id*. The showing of a reasonable articulable suspicion of danger to make a no-knock entry is necessary. "This showing is not high, but the police should be required to make it whenever the reasonableness of a no-knock entry is challenged." *Id*. at 394-95.

3

A SWAT team, having as one of its duties assistance in high-risk warrant service, assisted the officers serving the warrants in this case. Police entered appellant's apartment that he shared with Kimberly Haley to serve a warrant issued to search the apartment and a warrant issued for appellant's arrest. Both the search warrant and the arrest warrant were issued in the same homicide case. The officers did not knock and announce their presence before entering the apartment; they used a "flash-bang" diversionary device outside of the apartment window, and they then used a heavy "breaching tool" to force open the apartment door. Appellant argues that the evidence is insufficient to show the officers had a reasonable concern for their safety so as to allow them to enter the apartment without knocking and announcing their presence. On the other hand, the State argues that the evidence and the circumstances show the forceable no-knock entry into appellant's apartment was justified.

Because of their apprehension of danger in serving the warrants, the officers maintained a surveillance of the apartment prior to the search. Also, the officers obtained from the apartment manager a copy of the floor plan of the three bedroom apartment. The officers asserted that their decision to forcibly enter the apartment without knocking and announcing their presence was to alleviate their concern for their own safety as well as the safety of the occupants of the apartment. The officers had reliable information that appellant had in his possession in the apartment a nine millimeter Glock handgun and an SKS assault rifle. The officers knew of "a couple of previous weapons charges against Kristofer Marsh." The officers knew that Haley and appellant were then free on bond having been recently charged with a first degree felony offense; when arrested for that offense, appellant had a firearm in his possession. Most importantly, the officers

4

had evidence and knew that appellant was capable of aggressive, violent behavior on slight provocation. The warrants that the officers intended to serve were issued on a showing of probable cause that appellant, using a baseball bat, brutally beat and killed a strong, healthy young man. Appellant's provocation for killing the man was Haley's complaint to appellant about the man's alleged misbehavior toward her on a night club dance floor. Both appellant and Haley had boasted about appellant's heinous criminal act.

Giving proper deference to the trial court's ruling refusing to suppress the evidence, we conclude that the trial court did not abuse its discretion in finding that the officer's no-knock, unannounced, forcible entry into the apartment was justified. The evidence and the circumstances support the court's implied finding that the officers had a reasonable suspicion that their lives, and the lives of the occupants of the apartment, would be endangered if they knocked and announced their presence before entering the apartment to serve the warrants. Moreover, in our independent *de novo* review of the mixed questions of law and fact, not depending on the credibility and demeanor of the witness, we find that the overruling of the motion to suppress is supported by the evidence and circumstances shown. Appellant's third point of error is overruled.

### SEARCH WARRANT—DESCRIPTION OF ITEMS

In his first point of error, appellant insists that the "trial court erred in denying a motion to suppress evidence because the evidence was discovered after officers exceeded the authority granted by the search warrant and engaged in an exploratory search." Appellant argues that the warrant authorizing the search of the apartment did not authorize a search of the safe in which the officers found the cocaine he was charged with possessing. As we have already stated, abuse of

discretion is the standard by which a trial court's ruling on a motion to suppress evidence is reviewed. *See Balentine*, 71 S.W.3d at 768; *Villarreal v. State*, 935 S.W.2d 134, 138 (Tex. Crim. App. 1996).

The search warrant authorized officers to search for and seize, among other things, "rent receipts, utility bills, telephone bills, addressed mail, personal identification, keys, purchase receipts, sales receipts and photographs." These items could be concealed in the small safe the officers opened. When the safe was opened the officers saw the cocaine and immediately discontinued their search until another search warrant authorizing the seizure of the contraband was obtained. The evidence does not show that the officers engaged in an exploratory search unauthorized by the first search warrant. The trial court did not abuse its discretion in overruling appellant's motion to suppress the evidence. Appellant's first point of error is overruled.

In his second point of error, appellant complains that the "trial court erred in denying appellant's motion to suppress because the search warrant described some of the items sought in such an unconstitutionally vague manner as to invite an exploratory search." This complaint relates to items enumerated as: "(A) bat or similar blunt object, (B) black short sleeve button up shirt with a collar, (C) light colored pants, (D) shoes, (E) blood, (F) hair, (G) any articles of personal property tending to establish that the above listed individuals (Kristofer Marsh or Kimberly Haley) has or had dominion and control over the place and premises searched, including rent receipts, utility bills, telephone bills, addressed mail, personal identification, keys, purchase receipts, sales receipts and photographs, (H) tape."

6

The only authority cited by appellant relating to this point of error is *Walthall v. State*, 594 S.W.2d 74 (Tex. Crim. App. 1980). In that case the court condemned and disapproved the description of "all items of personal property commonly used in the commission of a criminal offense and in particular the offense of commercial exhibition of obscene material" and "all implements or instruments used in the commission of a crime." *Id*. at 78. In *Walthall*, the court held that although the description of film passed specificity muster, the two clauses just quoted were "unconstitutionally general" and that they "clearly authorize[d] a general, exploratory rummaging which is properly prohibited by the constitutions of this State and of the United States." *Id*. at 78-79.

Appellant concedes "the faulty averments from *Walthall* are truly general on their face; '[l]anguage of greater generality is difficult to imagine.' *Walthall*, 594 S.W.2d at 79." Appellant then argues, "In contrast, the objectionable list from the instant cause is facially very specific as to the particular items being sought. Nevertheless the end result is the same." We disagree. The descriptions of the items in the warrant and warrant affidavit in this case are not unconstitutionally vague. The trial court did not err in overruling the appellant's motion to suppress the evidence. Appellant's second point of error is overruled.

### FRUIT OF POISONOUS TREE DOCTRINE NOT APPLICABLE

In his fourth point of error, appellant urges that the trial court erred in denying his motion to suppress evidence because the "cocaine discovered in a safe was found as a result of custodial interrogation without benefit of *Miranda* warnings." The record reflects:

THE STATE:  Now, after the arrest warrant was executed, what did you do then?

7

DETECTIVE GERRISH: Ms. Marsh [Haley] and Mr. Marsh were then handcuffed and taken down to the station, but prior to them leaving, when we made entry into the house, we noticed a bunch of keys sitting on top of the kitchen counter and so we—I asked Mr. Marsh specifically which keys belonged to him, and he advised me that the keys that were wrapped around a lanyard were his keys because we were going to be seizing a vehicle and we wanted to know where the keys were.

Appellant had not been advised of his rights according to the requirements of *Miranda*[1] when he told Detective Tracy Gerrish that the keys were his. Using one of the keys Gerrish opened the safe in which the cocaine was found.

> The "fruit of the poisonous tree doctrine" . . . does not apply to mere violations of the prophylactic requirements in *Miranda*: while the statement taken in violation of *Miranda* must be suppressed, other evidence subsequently obtained as a result of that statement (i.e. the "fruits" of the statement) need not be suppressed. *Michigan v. Tucker*, 417 U.S. 433, 452, 94 S.Ct. 2357, 41 L.Ed.2d 182 . . . (1974); *Oregon v. Elstad*, 470 U.S. 298, 314, 105 S.Ct. 1285, 84 L.Ed.2d 222 . . . (1985). The rule . . . requires suppressing the fruits of a defendant's statement only when the statement was obtained through actual coercion. *Tucker*, 417 U.S. at 448-449, 94 S.Ct. at 2365-67*; Elstad*, 470 U.S. at 314; 105 S.Ct. at 1296.

*Baker v. State*, 956 S.W.2d 19, 22 (Tex. Crim. App. 1997); *Montemayor v. State*, 55 S.W.3d 78, 90 (Tex. App.—Austin 2001, pet. ref'd). The trial court did not abuse its discretion in denying appellant's motion to suppress evidence. Appellant's fourth point of error is overruled.

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

**JUROR CHALLENGE**

In his fifth point of error, appellant claims that the trial court erred in overruling his challenge of a prospective juror for cause. Before an appellant can claim that he was harmed by a trial court's denial of a defense challenge for cause, the record must show that (1) he exhausted all of his preemptory challenges, (2) he requested more challenges, (3) his request was denied, and (4) he identified an objectionable person seated on the jury upon whom he would have exercised a peremptory challenge. *Martinez v. State*, 17 S.W.3d 677, 682 (Tex. Crim. App. 2000); *Anson v. State*, 959 S.W.2d 203, 204 (Tex. Crim. App. 1997). In the trial court, appellant followed the procedural steps outlined and preserved for appellate review the error claimed. Therefore, we must determine whether the trial court erred in refusing to grant appellant's challenge of prospective juror Cynthia Horacek for cause.

Appellant argues that "objection to Horacek rested on grounds that she could not follow the burden of proof beyond a reasonable doubt." However, appellant "concedes that Horacek did not herself affirmatively state explicit disagreement with the reasonable doubt standard on the record."

In a lengthy, convoluted argument,[2] appellant urges that "the record leaves the impression that Horacek had difficulty in holding the State to the reasonable doubt standard of

---

[2] We quote from a part of appellant's brief in argument of this point of error:

. . . I have got to ask the panel, can you all assure me that under such a circumstance that you would be able to sign your name as a juror to the verdict form finding the defendant not guilty, even though you think they probably are guilty, but it is a circumstance where you don't believe the proof rose to the level

burden of proof upon which the defense is entitled to rely . . . . the trial court abused its discretion

in denying the challenge for cause."

---

of proof beyond a reasonable doubt?  Can you all do that?  Is there anyone here that is willing to admit to me in all honesty that they may not be able to do that under circumstances where the proof is less than beyond a reasonable doubt but it is more than a preponderance of the evidence?

. . .

VENIREPERSON NABORS:  If my gut told me they were guilty, I don't know that I could sign a not guilty.  I really don't think I could.

[Defense Counsel]: What is your name, ma'am?

VENIREPERSON NABORS: Jill Nabors

[Defense Counsel]: Anyone else feel that way?

VENIREPERSON HORACEK: Cindy Horacek.  If we are asked to prove—if the District Attorney proves that they are guilty and I feel that that is a true statement, then are you going to say technicalities not guilty [sic]?  I am going to have trouble with that.

Appellant concedes that Horacek did not herself affirmatively state explicit disagreement with the reasonable doubt standard on the record.  However, her fellow panel member Nabors had provided a rather explicit answer to [defense counsel's] line of questioning. Without further elaboration, Nabors' answer—"If my gut told me they were guilty, I don't know that I could sign a not guilty"—conveys a fundamental disagreement with the reasonable doubt standard.  By answering "Cindy Horacek" to [defense counsel's] question "anybody else feel that way?," venireperson Horacek not only identified herself, she also signified her agreement with Nabors' stated position on reasonable doubt.  The tenor of Horacek's follow-up question, when evaluated according to the context of defense counsel's preceding discussion of reasonable doubt, further indicates that her intent in taking the opportunity to speak was to express her discomfort with the concept of reasonable doubt.  She was therefore subject to a challenge for cause.

The denial or grant of a challenge for cause is within the discretion of the trial court and will not be overturned absent an abuse of that discretion. *Mooney v. State*, 817 S.W.2d 693, 701 (Tex. Crim. App. 1991). The reviewing court examines the record as a whole to determine whether there is support for the trial court's decisions, and, in doing so, gives great deference to the trial court. *Satterwhite v. State*, 858 S.W.2d 412, 415 (Tex. Crim. App. 1993). The trial court is able to consider such factors as demeanor and tone of voice that do not come through when reviewing a cold record. *Mooney*, 817 S.W.2d at 701. The trial court's decision is accorded great deference. *Id*.

After examination of the record, and the appellant's argument, we conclude that appellant has failed to demonstrate that Horacek, if she had been allowed to serve, would not have properly applied the reasonable doubt standard. Appellant has failed to show that the trial court abused its discretion in refusing to grant appellant's challenge of Horacek for cause. Appellant's fifth point of error is overruled.

## REFUSAL TO SEVER

In his sixth point of error, appellant complains that the trial court erred in refusing to grant his motion for severance because a joint trial was prejudicial. Appellant argues that the court erred in failing to grant him a separate trial at the guilt or innocence phase of trial and in the alternative at the punishment phase of trial.

### Art. 36.09. Severance on separate indictments

Two or more defendants who are jointly or separately indicted . . . for the same offense . . . may be, in the discretion of the court, tried jointly or separately

11

as to one or more defendants; . . . and provided further, that in cases in which, upon timely motion to sever, and evidence introduced thereon, it is made known to the court that there is a previous admissible conviction against one defendant or that a joint trial would be prejudicial to any defendant, the court shall order a severance as to the defendant whose joint trial would prejudice the other defendant or defendants.

Tex. Code Crim. Proc. Ann. art. 36.09 (West 1981).

Before trial the State agreed that it would not offer in evidence at the guilt or innocence phase of trial any prior convictions of appellant and it appears the co-defendant Haley had no previous convictions. Therefore, appellant was not entitled to severance and a separate trial as a matter of right under the provisions of article 36.09 of the code of criminal procedure. Appellant's motion for severance was filed after the trial commenced and was therefore untimely. Appellant relies upon the motions for severance filed by the co-defendant, Haley. Appellant states that appellant joined the co-defendant's "earlier motions retroactively by leave of court" and argues: "contrary to traditional notions of standing the fact that [the co-defendant's] motions were presented from [co-defendant] Haley's standpoint is immaterial, as the plain wording of the statute indicates ('. . . or that a joint trial would be prejudicial to *any* defendant. . . .,' TX C.C.P. 36.09, emphasis supplied)." Appellant cites no supporting authority and we find his contention untenable. Moreover, although counsel, particularly counsel for Haley, made extensive argument at trial concerning the issue of severance, no evidence was offered to support the motions for severance before they were overruled by the trial court. On appeal, appellant fails to show specifically how he was prejudiced by being tried with the co-defendant Haley. If either defendant was prejudiced by being tried with the co-defendant it was Haley at the punishment phase of the trial.

Absent evidence of prejudice to one defendant in a joint trial, or evidence that one of the defendants has a prior admissible conviction, a motion for severance is left to the trial court's discretion. *King v. State*, 17 S.W.3d 7, 16-17 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd); *Patterson v. State*, 783 S.W.2d 268, 270 (Tex. App.—Houston [14th Dist.] 1989, pet. ref'd). When an accused is not entitled to a severance as a matter of right, the denial of a severance motion by the trial court constitutes an abuse of discretion only when the movant satisfies the heavy burden of showing clear prejudice. *Id*. Moreover, the mere allegation that prejudice will result is not evidence of, or a sufficient showing of, prejudice under article 36.09, particularly when the severance is discretionary with the trial judge. *Id*. If the motion to sever is not supported by evidence, its denial is not an abuse of discretion. *Id*. Here, appellant has not met his heavy burden of showing clear prejudice. The trial court did not abuse its discretion in overruling appellant's motion for severance. Appellant's sixth point of error is overruled.

**VICTIM IMPACT EVIDENCE**

In his seventh point of error, appellant asserts that the trial court erred at the punishment phase of the trial by admitting victim impact evidence relating to an extraneous offense. The State contends that appellant has mischaracterized the complained of testimony of Arleen Adelman as victim impact evidence, but argues that if the testimony is victim impact evidence, it is relevant and its value is not substantially outweighed by the danger of unfair prejudice.

At the punishment phase of trial, the State offered the testimony of twelve witnesses to prove beyond a reasonable doubt that appellant had murdered Michael Adelman—an extraneous

13

offense. [3] One of these witnesses, who testified before Arleen Adelman, was Dr. Elizabeth Peacock, the deputy medical examiner; she testified about Michael Adelman's injuries, the cause of his death, and that his organs had been donated for the use of others. The last witness was Arleen Adelman, the mother of Michael Adelman. Before Arleen Adelman was allowed to testify about the evidence complained of, counsel for both defendants objected on the ground that Arleen Adelman's testimony would not be relevant. The objections were overruled. Counsel then asked the court "for a 403 balancing," which the court overruled.

Arleen Adelman testified about the family's ordeal while Michael Adelman was hospitalized:

Q. When you got to the hospital, tell me what you saw.

A. Michael Girard was there and there was a girl crying in the other room and I found out later—I didn't remember that that was Keith, but that was the girl that had witnessed what had happened that night. And she was hysterical, as we all were, and then they took us to see Mike. And he was just not moving or speaking or—his eyes were open, but he wasn't seeing anything.

Q. Was he in a hospital bed?

A. Yes, ma'am, with many plugs and tubes and everything imaginable. His head was shaved, which was such a shock, but there were staples all across the top of his head where his scalp had been fractured. I remember thinking how could his head be broken open that way. But they had an intracranial module in his head

---

[3] Appellant had been convicted previously of Michael Adelman's murder, but that conviction was not a final conviction at the time of the trial of this case.

by the time we saw him, so there was a big plug on top of his head where they could monitor his swelling and brain activity.

Q. Prior to seeing him, Ms. Adelman, was your son a pretty healthy, fit person?

A. He was very healthy. He was very conscious about his health. He didn't smoke. He didn't do drugs. He was always working out. I am sure he worked out even when he traveled. He would make sure he stayed at hotels where there was a gym. He loved sports. He was very, very active in every sport.

Q. When you saw him like this, were you able to communicate with him at all?

A. No, ma'am.

Q. Was your family and were there friends there?

A. There were friends there all the time. We were only allowed to go in once every hour or set times that we could go in. We had to keep the activity down because it seemed like a lot of his friends would want to come in and talk to him and there was a lot of crying going on and we would watch the gauge and it would move his intracranial pressure. So we were told to keep kind of quiet. But we were praying. We had priests there. We had a lot of people going in and out.

Q. It sounds like he was in an intensive care unit; is that right?

A. Yes, ma'am, the trauma unit.

Q. How long was he there?

A. He died on the sixth day, so I guess he was there five days.

Q. When he was there, was there any indication that he might get better?

A. Yes, ma'am. We were real hopeful at one point because he had started moving around and his eyes were tracking us. He seemed to have messages that he was getting across. He kept moving his hand and I know he was telling me to undo the restraint on his arm. He was trying to pull out plugs and tubes and things, and he was fighting so hard to live.

Q. Was there—did you get information—tell me, did that change?

15

A. Yeah. We thought he was getting better. I had even been told that we should try to look for a therapy center, that he probably would not—he wouldn't have been able to speak or possibly walk. We knew the damages were dreadful, but we did think he was doing better and we left the hospital that night.

He was doing a lot of movement and stirring a lot. He was trying to get out of the bed and he was moving to the end of the bed. I remember once my husband kind of held him down and we kept telling him that he was all right and that we thought he was coming out of the coma. I guess he was still in a semi-coma.

But that night when we went home, a nurse called me and said that we had better come back to the hospital, that he had taken a turn for the worse.

And we had already been approached by a pulmonary doctor because they did remove him from the respirator and they had taken the intracranial module out of his head. So that was a good sign, but then they felt like fluid was developing in his lungs so they need to put him back on the respirator. So the pulmonary doctor said things aren't looking good.

I remember saying, he is so healthy and so strong, he can lick pneumonia. But then a neurologist called and said that they needed to do another—I don't know if it was a CT scan or some type of brain activity test and they would have to put the module back into his skull. They found a brain stem bleed and so due to that bleeding he went into a deeper coma and his eyes no longer tracked us or he didn't look at us. He just laid there and never moved again.

Q. From that point, ma'am, did you get information that he was then declared brain dead?

A. Yes, ma'am.

Q. And did the family have to make a decision?

A. We knew both Matt's and Mike's wishes concerning their organs. They had it on their driver's license. It was a hard decision, but we knew that's what Mike would have done. Mike would have done anything for his friends or his family. He was that type person. He would have been proud that he could give life to other people.

Q. So Mike Adelman donated organs?

16

A. We have heard from the ex-policeman that has his heart and he is doing very well. He just says it was a miracle. There are three other people that received kidneys and liver and other organs. They are all doing well. We haven't heard from them.[4]

Following Arleen Adelman's testimony, counsel renewed their objections and asked the court to instruct the jury to disregard the testimony. The court refused to so instruct the jury.

The danger of unfair prejudice to a defendant inherent in the introduction of "victim impact" evidence with respect to a victim not named in the indictment on which he is being tried is unacceptably high. The admission of such evidence would open the door to admission of victim impact evidence arising from *any* extraneous offense committed by a defendant. Extraneous victim impact evidence, if anything, is more prejudicial than the non-extraneous victim impact evidence. . . . [S]uch evidence is irrelevant under Tex. R. Crim. Evid. 401.

*Cantu v. State*, 939 S.W.2d 627, 637 (Tex. Crim. App. 1997); *see also Boston v. State*, 965 S.W.2d 546, 550-51 (Tex. App.—Houston [14th Dist.] 1997, no pet.). Appellant was being tried for the offense of possession of cocaine with the intent to deliver—not for murder. The indictment charging the offense named no victim. It was error to admit evidence in the nature of victim impact evidence relating to the extraneous offense of murder. Moreover, before being admitted in a proper case, victim impact evidence is subject to the limitations imposed by Texas Rule of Evidence 403.

---

[4] The record reflects that the prosecutor was crying during her examination of Arleen Adelman.

17

*Ripowski v. State*, 61 S.W.3d 378, 390 (Tex. Crim. App. 2001); *Mosley v. State*, 983 S.W.2d 249, 265 (Tex. Crim. App. 1998).

Having determined that the evidence was erroneously admitted, we must decide whether the admission of this evidence was so harmful as to require a new trial on punishment. The error complained of is not of constitutional dimension. Other than constitutional error, any error that does not affect an appellant's substantial rights must be disregarded. Tex. R. App. P. 44.2(b). A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict, *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997), *Roberts v. State*, 29 S.W.3d 596, 602 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd); or leaves one in grave doubt whether it had such effect. *Espinosa v. State*, 29 S.W.3d 257, 259 (Tex. App.—Houston 2000, pet. ref'd).

During closing argument, the prosecutor characterized the complained of testimony of Arleen Adelman as victim impact evidence, arguing:

> The call to his family, the call at 3:00 o'clock in the morning as his family get the phone call that their strong, healthy son has been injured. And as they go and they tell and they rush to the hospital praying please, please, he will be okay. What do they see?
>
> This is what the mother and father see. This is what happens to Michael Adelman. So as the hospital is filled with family and friends as they comfort him, as the mother and father touch him and say it's going to be okay, mom is here. It's going to be okay. Dad is here. You are going to pull out of this. Every day praying, praying and hoping. God, help our baby.
>
> I believe the way that this—everything you have heard that they both should get, absolutely without a question should get a life sentence, both of them. Kristofer Marsh life, Kim Haley life. For everything they have done to this community, for

18

everything they have done to the Adelman family, for everything they have done to Michael Adelman.

You see, ladies and gentlemen, if that happens, then the family can go to the grave of Michael Adelman—because they do that. They go talk. They can't touch him. They can't see him, but they talk to him. They can go to his grave and they did say, son, we know you are not coming back to us. See, we can't bring him back, but we have asked for one thing and Travis County responded. We only want justice. Do you know what, son, we got justice. Kimberly Haley and Kris Marsh will sell no more drugs in this community. They will not hurt anybody else. They will not bash anyone's head in. They will not kill someone else. They will not do any other vicious act because justice was served. So, Mike, you can rest in peace. You can now rest in peace. Justice has been served in this case. We are now protected. Rest in peace.

The prosecutor in closing jury argument stressed and overemphasized the erroneously admitted victim impact evidence relating to the extraneous murder offense, obviously to justify the State's demand that the jury assess the most harsh and severe punishment for the charged offense of possessing cocaine.

In determining the magnitude of the harm resulting from the erroneous admission of the complained of evidence, we have examined, reviewed, and considered the whole record. We conclude that the error in admitting the victim impact evidence relating to the extraneous offense of murder had a substantial effect on the jury's verdict. There can be little doubt that the erroneously admitted evidence, and the way it was used by the State, substantially affected and influenced the jury in assessing appellant's punishment. We cannot disregard as harmless error the erroneous admission of this evidence relating to the extraneous murder offense. Appellant's seventh point of error is sustained.

19

The judgment of conviction is affirmed, but the judgment on punishment is reversed and the cause is remanded to the trial court for a new trial of the punishment phase of the trial. *See* Tex. Code Crim. Proc. Ann. art. 44.29(b) (West Supp. 2003).

_____

Carl E. F. Dally, Justice

Before Chief Justice Law, Justices Patterson and Dally[*]

Affirmed in Part, Reversed and
    Remanded in Part

Filed:  August 14, 2003

Publish

---

[*]  Before Carl E. F. Dally, Judge (retired), Court of Criminal Appeals, sitting by assignment. *See* Tex. Gov't Code Ann. § 74.003(b) (West 1998).