179 S.W.3d 746 (2005)
In the Matter of H.V.
No. 2-04-029-CV.
Court of Appeals of Texas, Fort Worth.
November 17, 2005.
*748 Tim Curry, Crim. D.A., Charles M. Mallin, Asst. Crim. D.A. and Chief of the Appellate Division, Anne E. Swenson, David M. Curl, Jim Hudson, Asst. Crim. D.As., Fort Worth, for Appellant (State).
Landrith & Kulesz, L.L.P., M. Shawn Matlock, Arlington, for Appellee.
PANEL B: HOLMAN, WALKER, and McCOY, JJ.

*749 OPINION ON REHEARING
SUE WALKER, Justice.
Following the issuance of our original opinion, the State filed a motion for rehearing arguing that we erred in our analysis of the State's second issue by drawing a distinction between a custodial statement made voluntarily in the accidental absence of Miranda warnings (an accidentally unwarned statement) and a custodial statement made after a suspect had invoked his right to counsel and questioning nonetheless continued (a post failure-to-honor-a-request-for-counsel statement). Because we hold that, in determining the applicability of the fruit-of-the-poisonous-tree doctrine, a distinction does exist between these two types of statements, we deny the State's motion for rehearing. We nonetheless withdraw our prior opinion and judgment and substitute this one to address the issues raised in the State's motion, to clarify the standard of review we applied in addressing the State's first issue, and to clarify certain facts.

I. INTRODUCTION
This is an interlocutory appeal by the State from the juvenile court's order granting a motion to suppress a confession and a gun obtained as a result of that confession.[1] In three points, the State contends that (1) Appellee H.V.'s second written statement should not have been suppressed because H.V. did not make an unequivocal request for counsel, (2) there was no justification for suppression of the firearm as alleged "fruit" of H.V.'s second written statement, and (3) section 52.02 of the Texas Family Code did not provide a basis to suppress either H.V.'s second written statement or the fruit of that statement. We will affirm.

II. FACTUAL AND PROCEDURAL BACKGROUND
On September 10, 2003, police began investigating the death of Daniel Oltmanns, a North Crowley High School student, whose body was found at a construction site. Daniel's wounds revealed that he had been shot in the head with a small caliber gun.
The next day, police and school administrators began interviewing students at North Crowley High School about the incident. A student at another high school notified the police that H.V. had purchased a gun a few days before the victim was shot.[2] On September 12, 2003, an officer questioned H.V. at the high school, and H.V. stated that he thought that Daniel might have owed somebody money for drugs and that this debt may have caused his death.
Detective Cheryl Johnson said that she wanted to take H.V. from school to the Youth Division and question him, and he *750 agreed to go. Upon arrival, Municipal Judge Alicia Johnson read H.V. the Miranda[3] warnings. Judge Johnson completed a "Warning to Child Offender" form which listed the Miranda warnings, and she and H.V. both signed it. H.V.'s only concern was that his parents did not know where he was, so Detective Johnson made an effort to contact H.V.'s parents. Detective Johnson then interrogated H.V. regarding the gun. H.V. executed a written statement  his first written statement, which was not suppressed  admitting that he had purchased a gun but stating that he had returned it to the seller before Daniel's body was found. Detective Johnson did not believe H.V. and suspected that the gun was at H.V.'s house. After H.V. and Judge Johnson signed H.V.'s completed statement, Detective Johnson took H.V. back to North Crowley High School and then drove to H.V.'s house, where she had requested that Officer Petrovic meet her.[4]
By the time the police arrived at H.V.'s house, H.V. was home from school, and H.V.'s father was home also.[5] Police asked for consent to search the home. Officer Petrovic translated for Detective Johnson as she introduced herself to H.V.'s father, explained that she was investigating the murder of Daniel Oltmanns, stated that officers had spoken with H.V. that morning and that he had admitted to having bought a gun, and said that she would like to search the house for the gun. H.V.'s father initially gave his consent but then spoke to his wife by phone and withdrew his permission to search the house. The police secured the residence while Detective Johnson went to obtain a search warrant.
The officers securing the house told H.V. and his father that they could not reenter the house. Despite this instruction, H.V. and his father tried a couple of times to gain access to the house but then left in a pickup truck. Later, an off-duty officer, who lived near H.V., spotted H.V. jumping over H.V.'s backyard fence. H.V. was carrying a rolled-up piece of carpet, and the off-duty officer told H.V. to drop the carpet and return to the front yard.[6] H.V. complied. The officers securing the house noticed that the carpet appeared to have blood on it. They arrested H.V. for tampering with evidence, handcuffed him, and placed him in the back of a patrol unit. H.V. spent approximately ninety minutes in the patrol car before he arrived at the juvenile processing office downtown. Before being transported to the juvenile processing office, H.V. made a spontaneous statement: "I didn't kill anyone. He shot himself with my gun."[7]
After H.V. arrived at the juvenile processing office, he was interviewed by Municipal Judge Bendslev at around 7:30 p.m. and was given Miranda warnings. Judge Bendslev completed the "Warning to Child Offender" form setting forth the Miranda warnings in connection with H.V.'s second written statement. That form, unlike the warning form provided by Judge Johnson *751 in connection with H.V.'s first written statement, is not signed by H.V.
Judge Bendslev appeared as a witness at the hearing on H.V.'s motion to suppress. She testified as follows:
Q. Okay, and at this point, you read him his rights: He had the right to remain silent, right to an attorney, okay?
A. (Nods affirmatively).
Q. And it's at this point when he said he didn't know; he would have to call his mom?
. . . .
A. He said, I want to call my mother.

Q. Okay.
A. I want her to ask for an attorney.

Q. Okay, and you said that he could not call his mother?
A. I said at that point I was in the process of giving him his magistrate warnings, and that calling his mother was not an option at that time.
Q. Okay, and you again advised him that he could ask for an attorney, make a statement, or not make a statement?
A. That's correct.
Q. And it's at this point that he said, but I'm only 16?
A. That's correct.
Q. As in, I'm only 16; I don't know how to contact an attorney?
A. No, I think he  I'm not sure what he meant when he said that. I mean, my impression was that he thought because of his age that he wasn't allowed to ask for an attorney, and I indicated to him that that was not a problem, that he was 16 and he could ask for an attorney if he wanted to ask for an attorney.
Q. And is it possible that he simply did not know the manner in which one goes about contacting an attorney?
A. It's possible. [Emphasis added.]
Judge Bendslev testified that, after H.V. said he wanted to talk to his mother, he wanted her to ask for an attorney,
I told him, we also had a brief conversation, he asked, well, I explained to him that if he chose not to make a statement at that time, that was fine, that he was currently being held in custody for tampering with physical evidence, and that he was ... under investigation for murder, and that if he wanted to speak to his mother, that he would be taken back down to the Juvenile facility at that time. I said, I don't know what timeframe would be involved as far as your being able to see your mother.
Thereafter, H.V. agreed to make a statement, and Detective Carroll sat down to talk with H.V. about Daniel's death. H.V. inquired about the "worst-case scenario" of what could happen to him, and Detective Carroll said that was for the court to decide. H.V. then gave his version of the events surrounding Daniel's death, stating that it was an accident and that Daniel had shot himself. H.V. drew a diagram of where he had disposed of the gun, and police subsequently located it. After H.V. signed his statement, along with the judge, police secured a warrant to arrest him for murder.
Based on the above testimony, the trial court made the following findings of fact and conclusions of law:
FINDINGS OF FACT
1. On September 12, 2003, Fort Worth Police officers attempted to secure a search warrant for the Respondent's residence. During that time, the Respondent and his father were advised *752 not to re-enter the residence pending the search. Respondent was arrested after exiting his residence with a rug.
2. Respondent was placed in the back of a patrol car for approximately one hour. He was later taken out to remove his handcuffs. The Respondent was then placed back into the patrol car for approximately another thirty minutes before being transported to the Fort Worth Police Department to be interviewed by Detective Carroll. At no point while Respondent was in the patrol car was any attempt made by Fort Worth Police to contact Respondent's parents as required by Texas Family Code Section 52.02.
3. Upon arrival, Fort Worth Magistrate Judge Gabrielle Bendslev interviewed the Respondent, and advised him of the warning required by Texas Family Code Section 51.095.
4. In response to questioning by Judge Bendslev regarding an attorney, the Respondent advised that he was only sixteen, that he did not know how to obtain an attorney, and that he wanted to contact his mother because he "wanted his mother to ask for an attorney."

5. Judge Bendslev advised the Respondent that he was not entitled to contact his mother at that time.
6. Following this, Respondent indicated that he would speak with police.
7. Respondent made a written statement, Exhibit 4, that among other things, indicated the location of the firearm involved in the death of Daniel Oltmanns. The police were able to locate the weapon.
CONCLUSIONS OF LAW
. . . .
3. The Respondent's request to speak to his mother was an unambiguous request for counsel.

4. Because of the foregoing conclusions of law, and considering the totality of the circumstances, the statement made by Respondent, Exhibit 4, following his arrest was obtained improperly and is inadmissible in trial.

5. The firearm recovered by the Fort Worth Police Department was only obtained as a result of improper questioning of Respondent, and therefore, is a "fruit of the poisonous tree" and is likewise inadmissible. [Emphasis added.]

III. INVOCATION OF RIGHT TO COUNSEL
In its first point, the State contends that the trial court erred by concluding that H.V.'s comments to Judge Bendslev constituted an unequivocal invocation of counsel. Specifically, the State argues that the trial court misapplied the law to the facts when it suppressed H.V.'s second written statement because its conclusion  that H.V. unambiguously invoked his right to counsel  is incorrect as a matter of law. H.V. responds that the trial court properly concluded that he made an unambiguous request for counsel, which should have ended the interview, when H.V. requested to speak to his mother so that she could ask for an attorney.

A. Standard of Review for Motion to Suppress
We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard of review. Carmouche v. State, 10 S.W.3d 323, 327 (Tex.Crim.App.2000); Guzman v. State, 955 S.W.2d 85, 89 (Tex.Crim.App.1997). In reviewing the trial court's decision, we do not engage in our own factual review. Romero v. State, 800 S.W.2d 539, 543 (Tex.Crim.App.1990); Best v. State, 118 S.W.3d 857, 861 (Tex.App.-Fort Worth 2003, no pet.). *753 At a suppression hearing, the trial judge is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony. Ross v. State, 32 S.W.3d 853, 855 (Tex.Crim.App.2000). Therefore, we give almost total deference to the trial court's rulings on (1) questions of historical fact and (2) application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor. Johnson v. State, 68 S.W.3d 644, 652-53 (Tex.Crim.App.2002); Best, 118 S.W.3d at 861-62. However, we review de novo a trial court's rulings on mixed questions of law and fact if they do not turn on the credibility and demeanor of witnesses. Johnson, 68 S.W.3d at 652-53.

B. Law Regarding Unambiguous Request for Counsel
Prior to a custodial interrogation, a suspect must be advised that he has a right to consult with an attorney. Miranda, 384 U.S. at 467-68, 86 S.Ct. at 1624-25. Interrogation must cease immediately if the suspect states that he wants an attorney. Id. at 474, 86 S.Ct. at 1628; see also Edwards v. Arizona, 451 U.S. 477, 485, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1981); McCarthy v. State, 65 S.W.3d 47, 51 (Tex.Crim.App.2001), cert. denied, 536 U.S. 972, 122 S.Ct. 2693, 153 L.Ed.2d 862 (2002); Dinkins v. State, 894 S.W.2d 330, 350 (Tex.Crim.App.), cert. denied, 516 U.S. 832, 116 S.Ct. 106, 133 L.Ed.2d 59 (1995). A suspect's invocation of his right to counsel must be "scrupulously honored." See Michigan v. Mosley, 423 U.S. 96, 103, 96 S.Ct. 321, 326, 46 L.Ed.2d 313 (1975). A request for counsel must be unambiguous, meaning the suspect must "articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." Davis v. United States, 512 U.S. 452, 459, 114 S.Ct. 2350, 2355, 129 L.Ed.2d 362 (1994). This standard, applied to adult suspects, also applies to juvenile suspects.[8]Fare v. Michael C., 442 U.S. 707, 725, 99 S.Ct. 2560, 2572, 61 L.Ed.2d 197 (1979). A custodial statement made voluntarily[9] after a suspect has invoked his right to counsel and questioning nonetheless continues renders the statement inadmissible in the State's case-in-chief, but the statement may be admissible for impeachment purposes. See Harris, 401 U.S. at 224-26, 91 S.Ct. at 644-46 (holding failure to warn suspect of his right to counsel rendered voluntary statement inadmissible in State's case-in-chief but statement was admissible for impeachment purposes); Oregon v. Hass, 420 U.S. 714, 722-24, 95 S.Ct. 1215, 1220-21, 43 L.Ed.2d 570 (1975) (holding post failure-to-honor-request-for-counsel statement admissible for impeachment purposes); Moran v. State, 171 S.W.3d *754 382, 392-94 (Tex.App.-Austin 2005, no pet.) (Puryear, J. dissenting.) (same); In re G.E., 879 A.2d 672, 676-80 (D.C.App.2005) (regarding juvenile's statement).
When reviewing alleged invocations of the right to counsel, we typically look at the totality of the circumstances surrounding the interrogation, as well as the alleged invocation, in order to determine whether a suspect's statement can be construed as an actual invocation of his right to counsel. Dinkins, 894 S.W.2d at 351; Lucas v. State, 791 S.W.2d 35, 45-46 (Tex.Crim.App.1989). The United States Supreme Court explained that the totality-of-the-circumstances approach allows the court the flexibility necessary to determine whether a juvenile has invoked his rights:
There is no reason to assume that such courts  especially juvenile courts, with their special expertise in this area  will be unable to apply the totality-of-the-circumstances analysis so as to take into account those special concerns that are present when young persons, often with limited experience and education and with immature judgment, are involved. Where the age and experience of a juvenile indicate that his request for his probation officer or his parents is, in fact, an invocation of his right to remain silent, the totality approach will allow the court the necessary flexibility to take this into account in making a waiver determination. At the same time, that approach refrains from imposing rigid restraints on police and courts in dealing with an experienced older juvenile with an extensive prior record who knowingly and intelligently waives his Fifth Amendment rights and voluntarily consents to interrogation.
Fare, 442 U.S. at 725-26, 99 S.Ct. at 2572 (emphasis added). This totality-of-the-circumstances test includes an evaluation of the juvenile's age, experience, education, background, and intelligence. Id. at 725, 99 S.Ct. at 2572; In re R.D., 627 S.W.2d 803, 806-07 (Tex.App.-Tyler 1982, no writ).

C. Review of Trial Court's Totality-of-the-Circumstances Determination
Here, the trial court heard live testimony from seven witnesses, and H.V. was present throughout the hearing, allowing the trial court to view his demeanor. The trial court found that before police transported H.V. to the police department where he made his second statement, he was detained for approximately one hour and thirty minutes in the back of a patrol car and was handcuffed for the majority of that time. H.V. was arrested and placed in the patrol car at approximately 4:30 p.m. At approximately 7:30 p.m., Judge Bendslev arrived to provide warnings to H.V., and she spent approximately ten minutes with him before she turned him over to police for interrogation. During H.V.'s ten minutes with Judge Bendslev, he stated that he wanted to talk to his mother; he wanted her to ask for an attorney; he was only sixteen. Judge Bendslev did not inform police that H.V. had asked to speak with his mother. She told police that "she did advise [H.V.] of his rights at that point, he had no questions, and he was agreeing to talk with [officers] at that point."
Thereafter, police began questioning H.V. Police spoke to H.V. "for probably over an hour, 45 minutes to an hour, before the statement was actually taken." Detective Carroll testified, "We talked about things such as soccer [and] the number of languages he spoke." At approximately 9:50 p.m., Detective Carroll began typing H.V.'s statement, and he finished at 10:35 p.m. Judge Bendslev reviewed the statement with H.V. at approximately 11:00 p.m.
*755 The totality of the circumstances surrounding the interrogation reflects that H.V. was a sixteen-year-old junior in high school. H.V. is from Bosnia; he had lived in the United States fewer than six years when he was arrested. There is no evidence that H.V. had been in trouble before or had any prior juvenile record that would have familiarized him with the criminal justice system.[10] H.V. was in custody for more than five hours before he made the statement, was handcuffed for one hour, and had no prior juvenile record. During the ten minutes that he received warnings from Judge Bendslev, he specifically asked to talk with his mother and said he wanted her to ask for an attorney. Judge Bendslev told him that he could not talk to his mother; if he did not want to talk to police, he would be returned to the juvenile facility, and she did not know what the timeframe was for H.V. to be able to speak to his mother. When Judge Bendslev tried to explain to H.V. that he himself could ask for an attorney, he said, "But I am only sixteen," clearly indicating that he did not understand how a sixteen-year-old person could ask for and go about contacting an attorney.[11] Judge Bendslev did not testify that H.V. affirmatively indicated that he did not want an attorney. Nor did she indicate that H.V. affirmatively stated that he wanted to talk to police despite his right to an attorney. Cf. Dewberry v. State, 4 S.W.3d 735, 747 (Tex.Crim.App.1999) (holding trial court properly denied motion to suppress confession when defendant was advised of right to counsel and responded by stating he had not "done anything wrong. I don't need a lawyer."), cert. denied, 529 U.S. 1131, 120 S.Ct. 2008, 146 L.Ed.2d 958 (2000). H.V. did not sign the "Warning to Child Offender" form, setting forth the Miranda warnings and signed by Judge Bendslev, in connection with his second written statement, and police chatted with H.V. for forty-five minutes to an hour before moving to the issue of the disappearance of Daniel Oltmanns.
The record demonstrates that H.V. articulated his desire to have counsel present sufficiently clearly that a reasonable magistrate judge in the circumstances would understand H.V.'s request to call his mother to be an unambiguous request for an attorney when such request was followed by his statement that he wanted his mother to ask for an attorney and his exclamation that he was only sixteen in response to Judge Bendslev's comment that he could ask for an attorney. See Davis, 512 U.S. at 459, 114 S.Ct. at 2355. This is not a situation in which the juvenile requested only to speak with his mother. Compare R.D., 627 S.W.2d at 806-07 (applying totality-of-circumstances test to hold that in light of defendant's juvenile record and experience on probation, psychologist's report indicating defendant was functioning in average cognitive range, and lack of evidence juvenile was worn down by improper interrogation tactics or lengthy questions, juvenile's statement that "he wanted to talk to his mother" standing alone was not invocation of right to counsel). The undisputed evidence establishes that H.V. said, "I want to call my mother. *756 I want her to ask for an attorney." When H.V. was told that he could ask for an attorney, he said, "But I am only sixteen." Consequently, this is more than a situation in which the defendant, with regard to hiring an attorney, equivocally says, "I want to talk to my mother about whether to hire an attorney"; this is a situation in which H.V. unequivocally indicated that he wanted an attorney  he wanted to call his mother; he wanted her to ask for an attorney. Accord Loredo v. State, 130 S.W.3d 275, 284 (Tex.App.-Houston [14th Dist.] 2004, pet. ref'd) (holding appellant's question of whether he could ask for a lawyer, followed by a police officer's comment that he could and that if he did the interrogation would cease, did not constitute an unambiguous invocation of the right to counsel when appellant thereafter continued to speak with the officer).
Moreover, the totality of the circumstances surrounding the interrogation supports the trial court's determination that H.V. invoked his right to counsel. See Mayes v. State, 8 S.W.3d 354, 361 (Tex.App.-Amarillo 1999, no pet.) (holding under totality of circumstances statement that "I have to get one for both of us" was unambiguous invocation of right to counsel). The facts at bar are the type of facts contemplated by the United States Supreme Court in Fare, 442 U.S. at 724-25, 99 S.Ct. at 2571-72. Here, H.V.'s age and lack of experience indicate that his request to call his mother, coupled with his statement that he wanted her to ask for an attorney and his exclamation that he was only sixteen, was in fact an invocation of his right to counsel, and the totality-of-the-circumstances approach allows the juvenile court the necessary flexibility to take this into account in determining whether a juvenile has invoked his Fifth Amendment rights. See id.
The cases relied upon by the State are distinguishable. The State cites State v. Hyatt, 355 N.C. 642, 566 S.E.2d 61 (2002), cert. denied, 537 U.S. 1133, 123 S.Ct. 916, 154 L.Ed.2d 823 (2003). But in Hyatt, evidence at the suppression hearing conclusively established that the defendant "whispered" to his father that he wanted his father to get an attorney for him. Id. at 70-71. In Hyatt, both officers testified that they did not hear the defendant ask his father to obtain an attorney, and the trial court made a specific finding of fact that "neither Agent Shook nor Detective Benjamin heard defendant's alleged invocation of his right to counsel." Id. Here, there is no question that Judge Bendslev heard H.V. state that he wanted to call his mother, he wanted her to ask for a lawyer, he was only sixteen.
The State also relies upon Fare, 442 U.S. at 719-20, 99 S.Ct. at 2569. But in Fare, the juvenile did not state that he wanted to call his mother because he wanted her to ask for a lawyer; the juvenile said he wanted to call his probation officer. Id. The United States Supreme Court held that the rule in Miranda is based on the critical position lawyers occupy in our legal system because of a lawyer's unique ability to protect the Fifth Amendment rights of a client undergoing custodial interrogation. Id. Because of a lawyer's special ability to help the client preserve his Fifth Amendment rights once the client becomes enmeshed in the adversary process, "the right to have counsel present at the interrogation is indispensable to the protection of the Fifth Amendment privilege." Id. (quoting Miranda, 384 U.S. at 469, 86 S.Ct. at 1625). Here, H.V. specifically indicated that he wanted to talk to his mother; he wanted her to ask for a lawyer. Through this request, H.V. sought a lawyer's unique ability and assistance, not simply the assistance of his mother or a probation officer.
*757 The State also cites Flamer v. Delaware, 68 F.3d 710, 725 (3d Cir.1995), cert. denied, 516 U.S. 1088, 116 S.Ct. 807, 133 L.Ed.2d 754 (1996). Flamer involved a twenty-five-year-old adult suspect. Id. at 719. At his arraignment hearing, Flamer asked permission to call his mother "to inquire about bail and possible representation by counsel." Id. at 725. The Third Circuit held that "a request for an attorney at arraignment is, in itself, insufficient to invoke the Fifth Amendment right to counsel at subsequent custodial interrogation." Id. at 726. Here, H.V. did not request an attorney at arraignment; he indicated that he wanted his mother to ask for an attorney prior to custodial interrogation.
Because the trial court is the sole judge of the credibility of the witnesses and the weight of their testimony, we hold that the trial court's findings and conclusions are supported by the record. Ross, 32 S.W.3d at 855. Viewing the totality of the circumstances, we hold that the trial court did not abuse its discretion in suppressing H.V.'s second written statement when it properly determined that H.V.'s request to talk to his mother because he wanted her to hire an attorney was a request for counsel. Compare R.D., 627 S.W.2d at 805-07 (applying totality of the circumstances and holding that bare request to talk to mother, without more, was not request for counsel). We overrule the State's first point.[12]

IV. SUPPRESSION OF WEAPON
In his second statement, which the trial court suppressed, H.V. explained that he "threw the gun in the gutter close to [his] house."[13] At the suppression hearing, Detective Carroll indicated that, as a result of H.V.'s second statement, police located the gun. During Detective Carroll's questioning, he said that H.V. told him that he took the gun and placed it in a sewer near his house, that H.V. drew a diagram of the gun's location, and that police found the gun.
In its second point, the State argues that even if H.V.'s second written statement is suppressed, the trial court erred by suppressing the gun as the alleged "fruit" of H.V.'s second written statement. H.V. responds that the violation of his Fifth Amendment right to counsel[14] mandates the suppression of not only his second statement but also the derivative evidence obtained from that statement.
Once an accused in custody has requested the assistance of an attorney, officers must terminate all interrogation until counsel is made available or the *758 accused voluntarily reinitiates communication. See Minnick v. Mississippi, 498 U.S. 146, 153, 111 S.Ct. 486, 491, 112 L.Ed.2d 489 (1990); Edwards, 451 U.S. at 484-85, 101 S.Ct. at 1885; Cross v. State, 144 S.W.3d 521, 526 (Tex.Crim.App.2004). An accused's request for an attorney is per se an invocation of his Fifth Amendment rights, requiring that all interrogation cease. Edwards, 451 U.S. at 485, 101 S.Ct. at 1885; Fare, 442 U.S. at 719, 99 S.Ct. at 2569; Rhode Island v. Innis, 446 U.S. 291, 298, 100 S.Ct. 1682, 1688, 64 L.Ed.2d 297 (1980). The presence of counsel insures the process of police interrogation conforms to the dictates of the Fifth Amendment privilege by insuring that an accused's statements made in a government-established atmosphere are not the product of compulsion. Miranda, 384 U.S. at 466, 86 S.Ct. at 1623; see also Fare, 442 U.S. at 719, 99 S.Ct. at 2569. Any statement taken after a person invokes his Fifth Amendment privilege "cannot be other than the product of compulsion, subtle or otherwise." Fare, 442 U.S. at 717, 99 S.Ct. at 2568 (quoting Miranda, 384 U.S. at 473-74, 86 S.Ct. at 1627-28).
Here, the trial court found that H.V. invoked his right to counsel. Deferring, as we must, to the historical facts found by the trial court and not challenged by the State, we have held that the trial court did not abuse its discretion by concluding that H.V. invoked his Fifth Amendment right to counsel. Consequently, all interrogation should have ceased. Edwards, 451 U.S. at 485, 101 S.Ct. at 1885; Fare, 442 U.S. at 719, 99 S.Ct. at 2569; Innis, 446 U.S. at 298, 100 S.Ct. at 1688. H.V.'s subsequent statement, "cannot be other than the product of compulsion, subtle or otherwise." Fare, 442 U.S. at 717, 99 S.Ct. at 2568 (quoting Miranda, 384 U.S. at 473-74, 86 S.Ct. at 1627-28). The magistrate's failure to honor H.V.'s invocation of his right to counsel, placing him instead directly into a custodial interrogation without counsel, operated to overcome H.V.'s free choice in producing a statement. See Miranda, 384 U.S. at 474, 86 S.Ct. 1628. The remaining question is whether our holding  that H.V.'s statement disclosing the location of the gun was taken in violation of his invoked right to the presence of counsel during custodial interrogation  mandates suppression of the gun as determined by the trial court.
The State points out, and we agree, that the "fruit of the poisonous tree" doctrine articulated in Wong Sun[15] does not apply to a mere failure to provide Miranda warnings to a suspect prior to custodial interrogation when the suspect makes a voluntary statement: while the statement must be suppressed, other evidence subsequently obtained as a result of that accidentally unwarned statement, that is the "fruit" of the statement, need not be suppressed. United States v. Patane, 542 U.S. 630, 639, 124 S.Ct. 2620, 2628, 159 L.Ed.2d 667 (2004) (holding accidental failure to give suspect Miranda warnings did not require suppression of physical fruits of suspect's unwarned but voluntary statement); Oregon v. Elstad, 470 U.S. 298, 307, 105 S.Ct. 1285, 1292, 84 L.Ed.2d 222 (1985) (holding accidentally unwarned statements may be used to impeach defendant's testimony at trial); see also Michigan v. Tucker, 417 U.S. 433, 452, 94 S.Ct. 2357, 2368, 41 L.Ed.2d 182 (1974); Baker v. State, 956 S.W.2d 19, 22 (Tex.Crim.App.1997); accord Marsh v. State, 115 S.W.3d 709, 715 (Tex.App.-Austin 2003, no pet.) (involving allegation of post-arrest interrogation before receiving Miranda warnings); Montemayor v. State, 55 S.W.3d 78, 90 (Tex.App.-Austin 2001, pet. ref'd) *759 (same). Here, however, H.V.'s second statement was not simply an unwarned statement; H.V. invoked his right to counsel before he made his second statement.
The State argues in its motion for rehearing that no distinction exists between fruit from an accidentally unwarned statement, like in Patane,[16] and fruit from a post failure-to-honor-a-request-for-counsel statement, like H.V.'s here. Stated another way, the State contends that the disregard of a suspect's invocation of his right to counsel should not trigger the application of the fruit-of-the-poisonous-tree doctrine because under Patane the accidental failure to provide Miranda warnings does not.[17] The Supreme Court of the United States has not explicitly addressed the issue of whether fruits derivative of a voluntary, post failure-to-honor-a-request-for-counsel statement are admissible in the State's case-in-chief, but numerous state and federal courts have, and they are split on the issue.[18]See Patterson v. United States, 485 U.S. 922, 922, 108 S.Ct. 1093, 1094, 99 L.Ed.2d 255 (1988) (White and Brennan, JJ., dissenting from denial of certiorari) (recognizing that the United States Supreme Court had "expressly left open the question of the admissibility of physical evidence obtained as a result of an interrogation conducted contrary to the rules set forth in Miranda" and recognizing the split among the lower courts). Because, as discussed below, in Elstad[19] the Supreme Court recognized a distinction between the admissibility of fruit from a custodial statement voluntarily made in the accidental absence of Miranda warnings  which does not involve a constitutional violation  and fruit from a violation of an accused's constitutional rights, and because the Supreme Court in *760 Dickerson v. United States[20] and in Missouri v. Seibert[21] affirmed that Miranda set forth a constitutionally based rule, we hold that such a distinction does exist and that fruits derivative of a voluntary, post failure-to-honor-a-request-for-counsel statement are inadmissible in the State's case-in-chief. See also Harris, 544 N.W.2d at 553 (holding "there is a critical difference between a mere defect in the administration of Miranda warnings `without more' and police-initiated interrogation conducted after a suspect unambiguously invokes the right to have counsel present during questioning"); Mark S. Bransdorfer, Note, Miranda Right-to-Counsel Violations and the Fruit of the Poisonous Tree Doctrine, 62 IND. L.J. 1061, 1061, 1097 (1987) (explaining why Wong Sun's fruit-of-the-poisonous-tree doctrine should apply to "second generation derivative evidence after an Edwards violation").
We begin by examining the fruit-of-the-poisonous-tree doctrine. Only evidence uncovered as a result of police infringement of a constitutional right is "fruit of the poisonous tree" because the constitutional infringement creates a "poisonous tree," and the evidence discovered as a result of the constitutional violation is the "fruit" of that violation. Wong Sun, 371 U.S. at 485-86, 83 S.Ct. at 416 (recognizing policy underlying exclusionary rule is to bar "any use of evidence unconstitutionally obtained"); see also Nix v. Williams, 467 U.S. 431, 442-43, 104 S.Ct. 2501, 2508, 81 L.Ed.2d 377 (1984) (purpose of fruit of poisonous tree doctrine is to "deter police from violations of constitutional and statutory protections"). There is no constitutional right, however, to receive Miranda warnings; that is, there is no constitutional right to be warned of your constitutional rights. New York v. Quarles, 467 U.S. 649, 654, 104 S.Ct. 2626, 2630, 81 L.Ed.2d 550 (1984) (quoting Tucker, 417 U.S. at 444, 94 S.Ct. at 2364) (recognizing that "[t]he prophylactic Miranda warnings therefore are `not themselves rights protected by the Constitution but [are] instead measures to insure that the right against compulsory self-incrimination [is] protected'"). Thus, because the accidental failure to give Miranda warnings does not infringe upon an accused's constitutional rights, an accidental failure to warn does not create a "poisonous tree." See, e.g., Patane, 542 U.S. at 637, 124 S.Ct. at 2626 (holding "mere failures to warn" do not violate the Constitution); Elstad, 470 U.S. at 304, 105 S.Ct. at 1290 (holding accidental failure to warn does not require suppression of second warned statement); Tucker, 417 U.S. 433, 452, 94 S.Ct. 2357, 2368, 41 L.Ed.2d 182 (same). In the absence of a "poisonous tree," physical "fruit" from a voluntary, accidentally unwarned statement need not be suppressed. See Patane, 542 U.S. at 636-37, 124 S.Ct. at 2626; Elstad, 470 U.S. at 304, 105 S.Ct. at 1290.
The Supreme Court, in Elstad, expressly recognized this distinction. In Elstad, two officers visited eighteen-year-old Elstad's home to arrest him in connection with a robbery at a neighbor's home. Elstad, 470 U.S. at 300-02, 304, 105 S.Ct. at 1288-90. When one of the officers asked Elstad if he knew a person by the neighbor's name, Elstad responded that he did and said that he had heard that there had been a robbery at the neighbor's home. Id. at 301, 105 S.Ct. at 1288-89. The officer stated his belief that Elstad was involved, and Elstad responded, "Yes, I was there." Id. Elstad was taken to police headquarters where he was Mirandized, *761 waived his rights, and gave a confession. Elstad argued that his initial statement, "Yes, I was there" had to be suppressed because he was not given his Miranda warnings before he made this statement. He also argued that his second statement was the "fruit" of the first, un Mirandized statement, so it also should be suppressed. The Oregon Court of Appeals agreed and suppressed the second, Mirandized statement. The United States Supreme Court reversed, explaining,
The Oregon court assumed and respondent here contends that a failure to administer Miranda warnings necessarily breeds the same consequences as police infringement of a constitutional right, so that evidence uncovered following an unwarned statement must be suppressed as "fruit of the poisonous tree."

Id. at 303-04, 105 S.Ct. at 1290 (emphasis added). Thus, in Elstad, the Supreme Court recognized a distinction in the admissibility of evidence uncovered following police infringement of a constitutional right and the admissibility of evidence uncovered following an accidentally unwarned statement.[22]
We consequently come to the question of whether a suspect's in-custody invocation of the right to counsel  that he has just been advised he possesses  constitutes the invocation of a constitutional right. If a suspect's invocation of his right to counsel constitutes the invocation of a constitutional right, the fruit-of-the-poisonous-tree doctrine is applicable. Accord id. at 470 U.S. at 304, 105 S.Ct. at 1290. If a suspect has no constitutional right to counsel during custodial interrogation, then the fruit-of-the-poisonous-tree doctrine is inapplicable, and the State's position is correct. Accord Patane, 542 U.S. at 636, 124 S.Ct. at 2625-26. Support for the proposition that the right to counsel during custodial interrogation is a Fifth Amendment constitutional right is found in numerous Supreme Court cases dealing with the right to counsel in the Fifth Amendment context.
As discussed in connection with the State's first point, the Supreme Court has repeatedly emphasized the importance of the right to counsel during custodial interrogation:
The rule in Miranda ... was based on this Court's perception that the lawyer occupies a critical position in our legal system because of his unique ability to protect the Fifth Amendment rights of a client undergoing custodial interrogation. Because of this special ability of the lawyer to help the client preserve his Fifth Amendment rights once the client becomes enmeshed in the adversary process, the Court found that `the right to have counsel present at the interrogation is indispensable to the protection of the Fifth Amendment privilege under the system' established by the Court.

Fare, 442 U.S. at 719, 99 S.Ct. at 2568-69 (emphasis added); see also Edwards, 451 U.S. at 484, 101 S.Ct. at 1884-85 (citing North Carolina v. Butler, 441 U.S. 369, 372-76, 99 S.Ct. 1755, 1757-59, 60 L.Ed.2d 286 (1979)) (safeguarding invoked right to counsel by imposing restrictions on subsequent waiver of that right).
Additional support for the constitutional nature of the right to counsel during custodial interrogation is found in Dickerson, 530 U.S. at 440, 120 S.Ct. at 2334. In Dickerson, the United States Supreme Court affirmed that the Miranda "system *762 established by the Court," presumably including the right to counsel during custodial interrogation, is founded upon the Fifth Amendment. Id. at 440, 120 S.Ct. at 2334 nn. 5, 6 (holding Miranda is "constitutionally based" and string citing multiple Supreme Court opinions). Because the Miranda rules are constitutionally based, the Dickerson Court declared unconstitutional a statute that required courts to gauge a confession's admissibility based solely on its voluntariness, without regard to compliance with Miranda. Id. at 440, 120 S.Ct. at 2334. The Dickerson Court held, "In sum, we conclude that Miranda announced a constitutional rule that Congress may not supersede legislatively." Id. at 444, 120 S.Ct. at 2336. We have no doubt that Dickerson prohibits a legislature from not only a wholesale abandonment of Miranda's constitutional rule but also from a piecemeal abandonment of Miranda's constitutional rule, such as a legislative elimination of a suspect's right to counsel during custodial interrogation. Accord Edwards, 451 U.S. at 482, 101 S.Ct. at 1883 (stating that "an accused has a Fifth and Fourteenth Amendment right to have counsel present during custodial interrogation"). Accordingly, because pursuant to Dickerson it would appear that a legislature is without authority to eliminate an accused's right to counsel during custodial interrogation, that right appears to be part and parcel of Miranda's Fifth Amendment constitutional rule.
Finally, still more support for the proposition that the right to counsel during custodial interrogation is a Fifth Amendment constitutional right is found in the Supreme Court's recent decision in Missouri v. Seibert. In Seibert, the Supreme Court addressed the admissibility of a statement when the Miranda warnings that were given were rendered totally ineffective. 542 U.S. at 604, 124 S.Ct. at 2605. Officers in Rolla, Missouri were trained to interrogate suspects in successive unwarned and warned phases. Id. at 609, 124 S.Ct. at 2608. Officers intentionally withheld Miranda warnings in the first, unwarned phase of the interrogation until a confession was obtained. Id. Officers then provided Miranda warnings and then covered the same ground again, thereby eliciting a post-warning, purportedly admissible statement. Id. at 609-10, 124 S.Ct. at 2608-09. Consequently, by the time the accused received Miranda warnings, he had already confessed and had no real choice concerning the invocation of his constitutional guarantees. Id. at 611-12, 124 S.Ct. at 2609-10. The Supreme Court held that, under these circumstances, the second, warned statement must also be suppressed because the warnings could not "function effectively as Miranda requires." Id. at 611-12, 124 S.Ct. at 2610.
Likewise, the "indispensable" right to counsel during custodial interrogation cannot function effectively as Miranda requires if the police are free to ignore an accused's invocation of his right to counsel in hopes of obtaining physical evidence that will be admissible against the accused. Counsel cannot exercise his unique ability to protect the Fifth Amendment rights of a client undergoing custodial interrogation if the custodial interrogation is completed in his absence. As explained by the Supreme Court of Wisconsin,
The rule argued for by the State [no suppression of fruits derivative of post failure-to-honor-a-request-for-counsel statement] would minimize the seriousness of the police misconduct producing the evidentiary fruits, breed contempt for the law, and encourage the type of conduct that Miranda was designed to *763 prevent.[23]
....
Regarding minimizing the seriousness of police misconduct and breeding contempt for the law, Professor Yale Kamisar has written:
Consider, for example, a situation where the suspect has invoked his right to counsel, but the police continue to question him in order to retrieve the murder weapon or some other nontestimonial evidence. In this set of circumstances[,] the police have nothing to lose by rejecting the request for counsel (they will lose any statement the suspect might make, but they would have lost any statement anyway if they had honored the suspect's request for counsel and immediately ceased all questioning) and something to gain (the use of physical evidence that the inadmissible statement might turn up).
Knapp, 700 N.W.2d at 918-19 (quoting Yale Kamisar, Postscript: Another Look at Patane and Seibert, the 2004 Miranda "Poisoned Fruit" Cases, 2 OHIO ST. J.CRIM. L. 97, 105 (2004)).
Seibert instructs that strategists cannot drain the substance out of Miranda by providing ineffective warnings that cannot serve their intended purposes. 542 U.S. at 617, 124 S.Ct. at 2613. The whole purpose of Miranda was to "give concrete constitutional guidelines for law enforcement agencies and courts to follow." Dickerson, 530 U.S. at 439, 120 S.Ct. at 2334 (quoting Miranda, 384 U.S. at 441-42, 86 S.Ct. at 1602). The concrete constitutional guidelines require that interrogation cease when an accused unambiguously invokes his right to counsel. See, e.g., Minnick, 498 U.S. at 153, 111 S.Ct. at 491; Edwards, 451 U.S. at 484-85, 101 S.Ct. at 1885; Cross, 144 S.W.3d at 526. To nonetheless hold that, if interrogation does not cease, fruits from the post invocation-of-the-right-to-counsel statement are admissible would impermissibly erode Miranda's concrete constitutional guidelines and drain all substance from the purported right to counsel during custodial interrogation. For these reasons, we hold that the right to counsel during custodial interrogation is a constitutional, Fifth Amendment right.[24]
As we previously discussed, H.V. was detained for approximately three hours  from 4:30 p.m. to 7:30 p.m.  before he was given Miranda warnings. As we have held, and the trial court found, H.V. invoked his right to counsel when he was informed of that right by Judge Bendslev. Nonetheless, Judge Bendslev turned H.V. over to police for interrogation and, from shortly after 7:30 p.m. until 10:35 p.m., police interrogated H.V. in the absence of counsel. After more than two hours of custodial interrogation, Detective Carroll began typing H.V.'s statement. The custodial interrogation of H.V. despite H.V.'s invocation of his right to counsel infringed *764 upon H.V.'s constitutional Fifth Amendment right to counsel. See Edwards, 451 U.S. at 481-82, 101 S.Ct. at 1883-84 (recognizing that Fifth Amendment right to counsel attaches during custodial interrogation). After H.V. incriminated himself in his second statement and therein disclosed the location of the gun, police concluded their interrogation and H.V.'s Fifth Amendment right to have counsel present during that completed interrogation was forever lost. This constitutional violation of H.V.'s Fifth Amendment right to counsel created a "poisonous tree." The evidence discovered as a result of this constitutional violation  the gun  is the "fruit" of that violation and must be suppressed, at least in the State's case-in-chief. See Hass, 420 U.S. at 722-24, 95 S.Ct. at 1220-21; Wong Sun, 371 U.S. at 485-86, 83 S.Ct. at 416.
We realize that we are to maintain the "closest possible fit ... between the Self-Incrimination Clause and any judge-made rule designed to protect it." Patane, 542 U.S. at 643, 124 S.Ct. at 2629-30. Here, the "fit" between H.V.'s invocation of his Fifth Amendment right to counsel and the trial court's suppression of the gun  the judge-made ruling  is a proper, close "fit." The Fifth Amendment right to counsel is protected only by an exclusionary rule that requires suppression of the physical fruits located as a result of information provided in a post failure-to-honor-a-request-for-counsel statement; otherwise, the Fifth Amendment right to counsel would truly exist only when interrogators decided to honor a suspect's request for counsel.[25] For these reasons, we hold that the trial court did not abuse its discretion by granting H.V.'s motion to suppress the gun located by police as a result of his second statement. Accord TEX. FAM.CODE ANN. § 54.03(e) (Vernon Supp.2005) (stating that evidence illegally seized or obtained is inadmissible in an adjudication hearing).[26]
Nor was evidence introduced at the suppression hearing that the gun would have been,[27] or was, discovered by means sufficiently distinguishable to be purged of the violation of H.V.'s Fifth Amendment privilege. Compare Thornton v. State, 145 S.W.3d 228, 233-34 (Tex.Crim.App.2004) (holding sufficient attenuating factors existed dissipating taint of illegal arrest from derivative evidence obtained as a result of arrest). We overrule the State's second point.[28]

V. CONCLUSION
Having overruled all of the State's points, we affirm the trial court's order *765 suppressing H.V.'s second written statement and the gun obtained as a result of that statement.
NOTES
[1] H.V. also requested that the trial court suppress his first written statement given on the morning of September 12, 2003, all evidence listed in the search warrant return (i.e., swabs, carpet, couch sample, carpet tack, shower curtain and rod, door handle, spray bottle, rag, t-shirt, towels, lint from dryer, shorts, briefs, plastic cover, cell phone, carpet sample from 1999 Honda Accord, seat sample from 1999 Honda Accord, camera from 1999 Honda Accord, 2 HP computers, blue trash bin, and brown trash bin), any evidence seized from his computer pursuant to the search warrant, and his spontaneous statements made while under arrest the afternoon of September 12, 2003. The trial court denied H.V.'s motion to suppress his first written statement, the evidence seized pursuant to the search warrants, the spontaneous statements H.V. made at the patrol car, and any statement H.V. made without being warned of his rights under the Vienna Convention. These rulings are not at issue here.
[2] During the week following the initial investigation, the police spoke to witnesses who saw H.V. purchase the gun.
[3] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[4] Detective Johnson requested Officer Petrovic's presence because she knew that H.V. had moved to the United States from Bosnia when he was in the fifth grade and suspected that she might need a translator when speaking with H.V.'s parents.
[5] H.V. made a phone call after Detective Johnson returned him to the school, and then he left campus.
[6] Officers did not see H.V. enter the house; the off-duty officer spotted him as he was leaving the residence.
[7] The trial court did not suppress this statement.
[8] Although the defendant carries the burden of unequivocally asserting his right to counsel, see Davis, 512 U.S. at 461-62, 114 S.Ct. at 2356-57, the State has the burden of establishing by a preponderance of the evidence that the defendant subsequently voluntarily waived his right to counsel. Moran v. Burbine, 475 U.S. 412, 421, 106 S.Ct. 1135, 1140-41, 89 L.Ed.2d 410 (1986) (holding State is required to establish alleged waiver "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it"). The State challenges only the trial court's finding that H.V. unambiguously invoked his right to counsel; it does not claim that, after invoking the right to counsel, H.V. subsequently waived that right.
[9] In this opinion, we use the term "voluntary" or "voluntarily" to describe statements made as the result of custodial interrogation when the defendant makes no claim that his statement was actually coerced or involuntary. See, e.g., Harris v. New York, 401 U.S. 222, 224, 91 S.Ct. 643, 645, 28 L.Ed.2d 1 (1971) (noting that "[p]etitioner makes no claim that the statements made to the police were coerced or involuntary").
[10] The State points to H.V.'s initial contact with the magistrate judge on the morning of September 12, 2003 to show that he was familiar with the magistrate warning process. The trial court as sole trier of the facts and judge of the credibility of the witnesses, however, was free to determine the weight to be accorded this fact in light of the totality of the circumstances. See Ross, 32 S.W.3d at 855.
[11] The trial court heard the witnesses, including Judge Bendslev, testify and the trial court interpreted H.V.'s statement that he was only sixteen as meaning "that he did not know how to ask for an attorney." See Finding of Fact Number 4.
[12] The State does not challenge on appeal the trial court's ruling that H.V.'s second written statement is inadmissible "at trial," or argue that H.V.'s statement, although inadmissible during the State's case-in-chief, may become admissible for impeachment purposes. Consequently, we do not address this issue.
[13] In H.V.'s first statement, which was not suppressed, he admitted purchasing a gun from a friend and identified the individuals present when he purchased it as well as the individuals to whom he subsequently showed the gun. In this first statement, H.V. claimed that he returned the gun to the seller because he decided he did not want it.
[14] The Sixth Amendment right to counsel does not attach until a prosecution is commenced, that is, "at or after the initiation of adversary judicial proceedings against the defendant." Green v. State, 934 S.W.2d 92, 97 (Tex.Crim.App.1996) (quoting United States v. Gouveia, 467 U.S. 180, 187, 104 S.Ct. 2292, 2297, 81 L.Ed.2d 146 (1984)), cert. denied, 520 U.S. 1200, 117 S.Ct. 1561, 137 L.Ed.2d 707 (1997). In this case, no charges had been brought against H.V. prior to the custodial interrogation at issue. Accordingly, we analyze the issue under the Fifth Amendment.
[15] Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).
[16] Patane, 542 U.S. at 636, 124 S.Ct. at 2625-26.
[17] The State relies heavily on Oregon v. Hass for this proposition. 420 U.S. at 722-24, 95 S.Ct. at 1220-21. But in Hass, the defendant's post failure-to-honor-a-request-for-counsel statement was suppressed and, likewise, the fruit of that statement  the defendant's pointing out the location of the stolen bicycle, was also suppressed. Id. The issue was whether the statement and its fruit were admissible as impeachment evidence. Id. Thus, we do not read Hass as supporting the State's argument that the gun in this case should not be suppressed in the State's case-in-chief.
[18] See, e.g., Boles v. Foltz, 816 F.2d 1132, 1135 (6th Cir.) (holding derivative evidence obtained through custodial interrogation following invocation of right to counsel inadmissible), cert. denied, 484 U.S. 857, 108 S.Ct. 167, 98 L.Ed.2d 121 (1987); United States v. Downing, 665 F.2d 404, 407-10 (1st Cir.1981) (same); United States ex rel. Hudson v. Cannon, 529 F.2d 890, 892-93 (7th Cir.1976) (same); United States v. Massey, 437 F.Supp. 843, 855-61 (M.D.Fla.1977) (same); Commonwealth v. White, 374 Mass. 132, 371 N.E.2d 777, 780-81 (1977), aff'd by an equally divided court, 439 U.S. 280, 99 S.Ct. 712, 58 L.Ed.2d 519 (1978) (same); State v. Harris, 199 Wis.2d 227, 544 N.W.2d 545, 553 (1996) (same); see also State v. Gravel, 135 N.H. 172, 601 A.2d 678, 682-86 (1991) (imposing bright-line state constitutional rule excluding all fruits from all statements taken in violation of Miranda); State v. Knapp, 700 N.W.2d 899, 921 (Wis.2005) (holding fruit derived from voluntary post failure-to-honor-a-request-for-counsel statement inadmissible under state constitution). Accord Calif. Attys for Criminal Justice v. Butts, 195 F.3d 1039, 1045-47 (9th Cir.) (op. on reh'g) (recognizing constitutional dimension of Fifth Amendment right to counsel), cert. denied, 530 U.S. 1261, 120 S.Ct. 2717, 147 L.Ed.2d 983 (2000). But see Taylor v. State, 274 Ga. 269, 553 S.E.2d 598, 604-05 (2001) (holding derivative evidence from voluntary, post failure-to-honor-invocation-of-right-to-counsel statement admissible in State's case-in-chief); State v. Goodman, 165 N.C.App. 865, 600 S.E.2d 28, 30 (2004) (same); United States ex rel. Winsett v. Washington, 860 F.Supp. 479, 483-85 (N.D.Ill.1994) (same).
[19] 470 U.S. at 307, 105 S.Ct. at 1292.
[20] 530 U.S. 428, 437, 120 S.Ct. 2326, 2333, 147 L.Ed.2d 405 (2000).
[21] 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004).
[22] The Supreme Court expressly recognized that Elstad had "suffered no identifiable constitutional harm." Id. at 307, 105 S.Ct. at 1292.
[23] In Knapp, police obtained a blood-stained sweatshirt as the "fruit" of Knapp's post invocation-of-the-right-to-counsel statement. In Knapp, as here, no allegations existed that Knapp's statement was involuntary under the traditional voluntariness standards. 700 N.W.2d at 899-902.
[24] We recognize that in 1997, before the United States Supreme Court wrote in Dickerson and Seibert that Miranda is a constitutional rule, the Texas Court of Criminal Appeals in Baker held that neither a suspect's consent to search given after the police failed to honor his request for counsel nor the items found in the search need be suppressed as fruits of the poisonous tree. Baker, 956 S.W.2d at 23 (citing Elstad and Tucker, which Patterson declared had left the issue undecided). We are, however, bound by the United States Supreme Court's more recent decisions in Dickerson and Seibert.
[25] We note that this is not a case like People v. Bradford, 14 Cal.4th 1005, 60 Cal.Rptr.2d 225, 929 P.2d 544, 565, cert. denied, 522 U.S. 953, 118 S.Ct. 377, 139 L.Ed.2d 293 (1997), cited by the State, where, after invoking his right to counsel, the defendant himself later initiated subsequent questioning. H.V.'s custodial interrogation followed immediately on the heels of his invocation of his right to counsel.
[26] In a supplemental letter brief, the State argues that Swain v. State, No. AP-74854, 181 S.W.3d 359, 364-67, 2005 WL 2861584, at *3-6 (Tex.Crim.App. Nov.2, 2005) holds that the gun in this case need not be suppressed. We cannot agree. Swain simply held that the appellant failed to preserve any alleged violation of his Fifth Amendment right to counsel as a ground for suppression. Id. at 367, *6.
[27] Texas does not recognize the inevitable discovery doctrine. State v. Daugherty, 931 S.W.2d 268, 269 (Tex.Crim.App.1996); see also Roquemore v. State, 60 S.W.3d 862, 870 n. 12 (Tex.Crim.App.2001) (same).
[28] In its third point, the State contends that the violation of Texas Family Code section 52.02 found by the trial court does not provide a basis for suppressing H.V.'s statement or the fruit of that statement. Because we have upheld the trial court's suppression rulings as set forth above, we need not address this argument. See TEX.R.APP. P. 47.1.