COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                 FORT
WORTH

 

 

                                        NO.
2-04-029-CV

 

 

IN THE
MATTER OF H.V.

 

                                                    

                                              ------------

 

           FROM THE 323RD
DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                                OPINION ON REHEARING

 

                                              ------------

 








Following the issuance of our original opinion,
the State filed a motion for rehearing arguing that we erred in our analysis of
the State=s second issue by drawing a
distinction between a custodial statement made voluntarily in the accidental
absence of Miranda warnings (an accidentally unwarned statement) and a
custodial statement made after a suspect had invoked his right to counsel and
questioning nonetheless continued (a post failure-to-honor-a-request-for-counsel
statement).  Because we hold that, in
determining the applicability of the fruit-of-the-poisonous-tree doctrine, a
distinction does exist between these two types of statements, we deny the State=s motion
for rehearing.  We nonetheless withdraw
our prior opinion and judgment and substitute this one to address the issues
raised in the State=s motion, to clarify the
standard of review we applied in addressing the State=s first
issue, and to clarify certain facts.

I. 
Introduction








This is an interlocutory appeal by the State from the
juvenile court=s order granting a motion to suppress a
confession and a gun obtained as a result of that confession.[1]  In three points, the State contends that (1)
Appellee H.V.=s second written statement should not have
been suppressed because H.V. did not make an unequivocal request for counsel,
(2) there was no justification for suppression of the firearm as alleged Afruit@ of H.V.=s second written
statement, and (3) section 52.02 of the Texas Family Code did not provide a
basis to suppress either H.V.=s second written
statement or the fruit of that statement. 
We will affirm. 

II.  Factual and Procedural Background

On September 10, 2003, police began investigating the death
of Daniel Oltmanns, a North Crowley High School student, whose body was found
at a construction site.  Daniel=s wounds revealed
that he had been shot in the head with a small caliber gun. 

The next day, police and school administrators began
interviewing students at North Crowley High School about the incident.  A student at another high school notified the
police that H.V. had purchased a gun a few days before the victim was shot.[2]  On September 12, 2003, an officer questioned
H.V. at the high school, and H.V. stated that he thought that Daniel might have
owed somebody money for drugs and that this debt may have caused his death.








Detective Cheryl Johnson said that she wanted to take H.V.
from school to the Youth Division and question him, and he agreed to go.  Upon arrival, Municipal Judge Alicia Johnson
read H.V. the Miranda[3]
warnings.  Judge Johnson completed a
AWarning
to Child Offender@ form which listed the Miranda
warnings, and she and H.V. both signed it. 
H.V.=s only concern was
that his parents did not know where he was, so Detective Johnson made an effort
to contact H.V.=s parents. 
Detective Johnson then interrogated H.V. regarding the gun.  H.V. executed a written statementChis first written
statement, which was not suppressedCadmitting that he
had purchased a gun but stating that he had returned it to the seller before
Daniel=s body was
found.  Detective Johnson did not believe
H.V. and suspected that the gun was at H.V.=s house.  After H.V. and Judge Johnson signed H.V.=s completed
statement, Detective Johnson took H.V. back to North Crowley High School and
then drove to H.V.=s house, where she had requested that
Officer Petrovic meet her.[4]








By the time the police arrived at H.V.=s house, H.V. was
home from school, and H.V.=s father was home
also.[5]  Police asked for consent to search the home.  Officer Petrovic translated for Detective
Johnson as she introduced herself to H.V.=s father,
explained that she was investigating the murder of Daniel Oltmanns, stated that
officers had spoken with H.V. that morning and that he had admitted to having
bought a gun, and said that she would like to search the house for the
gun.  H.V.=s father initially
gave his consent but then spoke to his wife by phone and withdrew his
permission to search the house.  The
police secured the residence while Detective Johnson went to obtain a search
warrant.  








The officers securing the house told H.V. and his father
that they could  not reenter the
house.  Despite this instruction, H.V.
and his father tried a couple of times to gain access to the house but then
left in a pickup truck. Later, an off-duty officer, who lived near H.V., spotted
H.V. jumping over H.V.=s backyard fence.  H.V. was carrying a rolled-up piece of
carpet, and the off-duty officer told H.V. to drop the carpet and return to the
front yard.[6]  H.V. complied.  The officers securing the house noticed that
the carpet appeared to have blood on it. 
They arrested H.V. for tampering with evidence, handcuffed him, and
placed him in the back of a patrol unit. 
H.V. spent approximately ninety minutes in the patrol car before he
arrived at the juvenile processing office downtown.  Before being transported to the juvenile
processing office, H.V. made a spontaneous statement:  AI didn=t kill
anyone.  He shot himself with my gun.@[7]

After H.V. arrived at the juvenile processing office, he
was interviewed by Municipal Judge Bendslev at around 7:30 p.m. and was given Miranda
warnings.  Judge Bendslev completed
the AWarning
to Child Offender@ form setting forth the Miranda
warnings in connection with H.V.=s second
written statement.  That form, unlike the
warning form provided by Judge Johnson in connection with H.V.=s first
written statement, is not signed by H.V.

Judge Bendslev appeared as a witness at the
hearing on H.V.=s motion to suppress.  She testified as follows:

Q.  Okay, and at this point, you
read him his rights:  He had the right to
remain silent, right to an attorney, okay?

 

A.  (Nods affirmatively).

 

Q.  And it=s at this point when he
said he didn=t know; he would have to
call his mom?

 

. . .
.

 

A.  He said, I want to call
my mother.

 

Q.  Okay.

 

A.  I want her to ask for an
attorney.

 

Q.  Okay, and you said that he
could not call his mother?








A.  I said at that point I was
in the process of giving him his magistrate warnings, and that calling his
mother was not an option at that time.

 

Q.  Okay, and you again advised
him that he could ask for an attorney, make a statement, or not make a
statement?

 

A.  That=s correct.

 

Q.  And it=s at this point that he
said, but I=m only 16?

 

A.  That=s correct.

 

Q. As in, I=m only 16; I don=t know how to contact an
attorney?

 

A.  No, I think he - - I=m not sure what he meant
when he said that.  I mean, my impression
was that he thought because of his age that he wasn=t allowed to ask for an
attorney, and I indicated to him that that was not a problem, that he was 16
and he could ask for an attorney if he wanted to ask for an attorney.

 

Q.  And is it possible that he
simply did not know the manner in which one goes about contacting an attorney?

 

A.  It=s
possible.  [Emphasis added.]

Judge Bendslev testified that, after H.V. said he wanted to talk to
his mother, he wanted her to ask for an attorney,

I told him, we also had a brief conversation, he
asked, well, I explained to him that if he chose not to make a statement at
that time, that was fine, that he was currently being held in custody for
tampering with physical evidence, and that he was . . . under investigation for
murder, and that if he wanted to speak to his mother, that he would be taken
back down to the Juvenile facility at that time.  I said, I don=t know
what timeframe would be involved as far as your being able to see your mother.








Thereafter, H.V. agreed to make a statement, and
Detective Carroll sat down to talk with H.V. about Daniel=s
death.  H.V. inquired about the Aworst-case
scenario@ of what
could happen to him, and Detective Carroll said that was for the court to
decide.  H.V. then gave his version of
the events surrounding Daniel=s death,
stating that it was an accident and that Daniel had shot himself.  H.V. drew a diagram of where he had disposed
of the gun, and police subsequently located it. 
After H.V. signed his statement, along with the judge, police secured a
warrant to arrest him for murder.

Based on the above testimony, the trial court
made the following findings of fact and conclusions of law:

FINDINGS OF FACT

1.  On September 12, 2003, Fort Worth Police
officers attempted to secure a search warrant for the Respondent=s residence.  During that time, the Respondent and his
father were advised not to re-enter the residence pending the search.  Respondent was arrested after exiting his
residence with a rug.

 

2.  Respondent was placed in the back of a patrol
car for approximately one hour.  He was
later taken out to remove his handcuffs. 
The Respondent was then placed back into the patrol car for
approximately another thirty minutes before being transported to the Fort Worth
Police Department to be interviewed by Detective Carroll.  At no point while Respondent was in the
patrol car was any attempt made by Fort Worth Police to contact Respondent=s parents as required by
Texas Family Code Section 52.02.

 








3.  Upon arrival, Fort Worth Magistrate Judge
Gabrielle Bendslev interviewed the Respondent, and advised him of the warning
required by Texas Family Code Section 51.095.

 

4.  In response to questioning by Judge
Bendslev regarding an attorney, the Respondent advised that he was only
sixteen, that he did not know how to obtain an attorney, and that he wanted to
contact his mother because he Awanted his mother to ask for an attorney.@

 

5.  Judge Bendslev advised the Respondent that he
was not entitled to contact his mother at that time.

 

6.  Following this, Respondent indicated that he
would speak with police.

 

7.  Respondent made a written statement, Exhibit
4, that among other things, indicated the location of the firearm involved in
the death of Daniel Oltmanns.  The police
were able to locate the weapon.

 

CONCLUSIONS OF LAW

 

. . .
.

 

3.  The Respondent=s request to speak to his
mother was an unambiguous request for counsel.

 

4.  Because of the foregoing conclusions of
law, and considering the totality of the circumstances, the statement made by
Respondent, Exhibit 4, following his arrest was obtained improperly and is
inadmissible in trial.

 

5.  The
firearm recovered by the Fort Worth Police Department was only obtained as a
result of improper questioning of Respondent, and therefore, is a Afruit of
the poisonous tree@ and is likewise
inadmissible.  [Emphasis added.]

 








III.  Invocation of Right to Counsel

In its first point, the State contends that the trial court
erred by concluding that H.V.=s comments to
Judge Bendslev constituted an unequivocal invocation of counsel.  Specifically, the State argues that the trial
court misapplied the law to the facts when it suppressed H.V.=s second written
statement because its conclusionCthat H.V.
unambiguously invoked his right to counselCis incorrect as a
matter of law.  H.V. responds that the
trial court properly concluded that he made an unambiguous request for counsel,
which should have ended the interview, when H.V. requested to speak to his
mother so that she could ask for an attorney.

A.      Standard of Review for Motion to Suppress 








We review a trial court's ruling on a motion to suppress
evidence under a bifurcated standard of review. 
Carmouche v. State, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000); Guzman
v. State, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997).  In reviewing the trial court's decision, we
do not engage in our own factual review. 
Romero v. State, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990); Best
v. State, 118 S.W.3d 857, 861 (Tex. App.CFort Worth 2003,
no pet.).  At a suppression hearing, the
trial judge is the sole trier of fact and judge of the credibility of the
witnesses and the weight to be given their testimony. Ross v. State, 32
S.W.3d 853, 855 (Tex. Crim. App. 2000). 
Therefore, we give almost total deference to the trial court's rulings
on (1) questions of historical fact and (2) application‑of‑law‑to‑fact
questions that turn on an evaluation of credibility and demeanor.  Johnson v. State, 68 S.W.3d 644, 652‑53
(Tex. Crim. App. 2002); Best, 118 S.W.3d at 861‑62.  However, we review de novo a trial court's
rulings on mixed questions of law and fact if they do not turn on the
credibility and demeanor of witnesses.  Johnson,
68 S.W.3d at 652‑53.

B.      Law Regarding Unambiguous Request for
Counsel













Prior to a custodial interrogation, a suspect
must be advised that he has a right to consult with an attorney.  Miranda, 384 U.S. at 467‑68, 86
S. Ct.  at 1624‑25.  Interrogation must cease immediately if the
suspect states that he wants an attorney. 
Id. at 474, 86 S. Ct. at 1628; see also Edwards v. Arizona, 451
U.S. 477, 485, 101 S. Ct. 1880, 1885 (1981); McCarthy v. State, 65
S.W.3d 47, 51 (Tex. Crim. App. 2001), cert. denied, 536 U.S. 972 (2002);
Dinkins v. State, 894 S.W.2d 330, 350 (Tex. Crim. App.), cert. denied,
516 U.S. 832 (1995).  A suspect=s
invocation of his right to counsel must be Ascrupulously
honored.@  See Michigan v. Mosley, 423 U.S. 96,
103, 96 S. Ct. 321, 326 (1975).  A
request for counsel must be unambiguous, meaning the suspect must Aarticulate
his desire to have counsel present sufficiently clearly that a reasonable
police officer in the circumstances would understand the statement to be a
request for an attorney.@ 
Davis v. United States, 512 U.S. 452, 459, 114 S. Ct. 2350, 2355
(1994).  This standard, applied to adult
suspects, also applies to juvenile suspects.[8]  Fare v. Michael C., 442 U.S. 707, 725,
99 S. Ct. 2560, 2572 (1979).  A custodial
statement made voluntarily[9]
after a suspect has invoked his right to counsel and questioning nonetheless
continues renders the statement inadmissible in the State=s
case-in-chief, but the statement may be admissible for impeachment
purposes.  See Harris, 401 U.S. at
224-26, 91 S. Ct. at 644-46 (holding failure to warn suspect of his right to
counsel rendered voluntary statement inadmissible in State=s
case-in-chief but statement was admissible for impeachment purposes); Oregon
v. Hass, 420 U.S. 714, 722-24, 95 S. Ct. 1215, 1220-21 (1975) (holding post
failure-to-honor-request-for-counsel statement admissible for impeachment
purposes); Moran v. State, 171 S.W.3d 382, 392-94 (Tex. App.CAustin
2005, no pet.) (Puryear, J. dissenting.) (same); In re G.E., 879 A.2d
672, 676-80 (D.C. App. 2005) (regarding juvenile=s
statement).

When reviewing alleged invocations of the right
to counsel, we typically look at the totality of the circumstances surrounding
the interrogation, as well as the alleged invocation, in order to determine
whether a suspect's statement can be construed as an actual invocation of his
right to counsel.  Dinkins, 894
S.W.2d at 351; Lucas v. State, 791 S.W.2d 35, 45-46 (Tex. Crim. App.
1989).  The United States Supreme Court
explained that the totality-of-the-circumstances approach allows the court the
flexibility necessary to determine whether a juvenile has invoked his rights:

There is no reason to
assume that such courtsCespecially juvenile
courts, with their special expertise in this areaCwill be unable to apply
the totality-of-the-circumstances analysis so as to take into account those
special concerns that are present when young persons, often with limited
experience and education and with immature judgment, are involved.  Where the age and experience of a juvenile
indicate that his request for his probation officer or his parents is, in fact,
an invocation of his right to remain silent, the totality approach will allow
the court the necessary flexibility to take this into account in making a
waiver determination.  At the same
time, that approach refrains from imposing rigid restraints on police and
courts in dealing with an experienced older juvenile with an extensive prior
record who knowingly and intelligently waives his Fifth Amendment rights and
voluntarily consents to interrogation.

 








Fare, 442 U.S. at 725-26, 99 S. Ct. at 2572 (emphasis
added).  This
totality-of-the-circumstances test includes an evaluation of the juvenile=s age,
experience, education, background, and intelligence.  Id. at 725, 99 S. Ct. at 2572; In
re R.D., 627 S.W.2d 803, 806-07 (Tex. App.CTyler
1982, no writ).

C.     Review of Trial Court=s
Totality-of-the-Circumstances Determination

Here, the trial court heard live testimony from
seven witnesses, and H.V. was present throughout the hearing, allowing the
trial court to view his demeanor.  The
trial court found that before police transported H.V. to the police department
where he made his second statement, he was detained for approximately one hour
and thirty minutes in the back of a patrol car and was handcuffed for the
majority of that time.  H.V. was arrested
and placed in the patrol car at approximately 4:30 p.m.  At approximately 7:30 p.m., Judge Bendslev
arrived to provide warnings to H.V., and she spent approximately ten minutes
with him before she turned him over to police for interrogation.  During H.V.=s ten
minutes with Judge Bendslev, he stated that he wanted to talk to his mother; he
wanted her to ask for an attorney; he was only sixteen.  Judge Bendslev did not inform police that
H.V. had asked to speak with his mother. 
She told police that Ashe did advise
[H.V.] of his rights at that point, he had no questions, and he was agreeing to
talk with [officers] at that point.@ 








Thereafter, police began questioning H.V.  Police spoke to H.V. Afor
probably over an hour, 45 minutes to an hour, before the statement was actually
taken.@  Detective Carroll testified, AWe
talked about things such as soccer [and] the number of languages he spoke.@  At approximately 9:50 p.m., Detective Carroll
began typing H.V.=s statement, and he finished at
10:35 p.m.  Judge Bendslev reviewed the
statement with H.V. at approximately 11:00 p.m. 








The totality of the circumstances surrounding the
interrogation reflects that H.V. was a sixteen-year-old junior in high
school.  H.V. is from Bosnia; he had
lived in the United States fewer than six years when he was arrested. There is
no evidence that H.V. had been in trouble before or had any prior juvenile
record that would have familiarized him with the criminal justice system.[10]  H.V. was in custody for more than five hours
before he made the statement, was handcuffed for one hour, and had no prior
juvenile record.  During the ten minutes
that he received warnings from Judge Bendslev, he specifically asked to talk
with his mother and said he wanted her to ask for an attorney.  Judge Bendslev told him that he could not
talk to his mother; if he did not want to talk to police, he would be returned
to the juvenile facility, and she did not know what the timeframe was for H.V.
to be able to speak to his mother.  When
Judge Bendslev tried to explain to H.V. that he himself could ask for an
attorney, he said, ABut I am only sixteen,@ clearly
indicating that he did not understand how a sixteen-year-old person could ask
for and go about contacting an attorney.[11]  Judge Bendslev did not testify that H.V.
affirmatively indicated that he did not want an attorney.  Nor did she indicate that H.V. affirmatively
stated that he wanted to talk to police despite his right to an attorney.  Cf. Dewberry v. State, 4 S.W.3d 735,
747 (Tex. Crim. App. 1999) (holding trial court properly denied motion to
suppress confession when defendant was advised of right to counsel and
responded by stating he had not Adone
anything wrong.  I don=t need a
lawyer.@), cert.
denied, 529 U.S. 1131 (2000).  H.V.
did not sign the AWarning to Child Offender@ form,
setting forth the Miranda warnings and signed by Judge Bendslev, in
connection with his second written statement, and police chatted with H.V. for
forty-five minutes to an hour before moving to the issue of the disappearance
of Daniel Oltmanns. 













The record demonstrates that H.V. articulated his
desire to have counsel present sufficiently clearly that a reasonable
magistrate judge in the circumstances would understand H.V.=s
request to call his mother to be an unambiguous request for an attorney when
such request was followed by his statement that he wanted his mother to ask for
an attorney and his exclamation that he was only sixteen in response to Judge
Bendslev=s
comment that he could ask for an attorney. 
See Davis, 512 U.S. at 459, 114 S. Ct. at 2355.  This is not a situation in which the juvenile
requested only to speak with his mother. 
Compare R.D., 627 S.W.2d at 806-07 (applying
totality-of-circumstances test to hold that in light of defendant=s
juvenile record and experience on probation, psychologist=s report
indicating defendant was functioning in average cognitive range, and lack of
evidence juvenile was worn down by improper interrogation tactics or lengthy
questions, juvenile=s statement that Ahe
wanted to talk to his mother@
standing alone was not invocation of right to counsel).  The undisputed evidence establishes that H.V.
said, AI want
to call my mother.  I want her to ask for
an attorney.@ 
When H.V. was told that he could ask for an attorney, he said, ABut I am
only sixteen.@ 
Consequently, this is more than a situation in which the defendant, with
regard to hiring an attorney, equivocally says, AI want
to talk to my mother about whether to hire an attorney@; this
is a situation in which H.V. unequivocally indicated that he wanted an attorneyChe
wanted to call his mother; he wanted her to ask for an attorney.  Accord Loredo v. State, 130 S.W.3d
275, 284 (Tex. App.CHouston [14th Dist.] 2004, pet.
ref=d)
(holding appellant=s question of whether he could
ask for a lawyer, followed by a police officer=s
comment that he could and that if he did the interrogation would cease, did not
constitute an unambiguous invocation of the right to counsel when appellant thereafter
continued to speak with the officer).

Moreover, the totality of the circumstances
surrounding the interrogation supports the trial court=s
determination that H.V. invoked his right to counsel.  See Mayes v. State, 8 S.W.3d 354, 361
(Tex. App.CAmarillo 1999, no pet.) (holding
under totality of circumstances statement that AI have
to get one for both of us@ was unambiguous invocation of
right to counsel).  The facts at bar are
the type of facts contemplated by the United States Supreme Court in Fare.  442 U.S. at 724-25, 99 S. Ct. at
2571-72.  Here, H.V.=s age
and lack of experience indicate that his request to call his mother, coupled
with his statement that he wanted her to ask for an attorney and his
exclamation that he was only sixteen, was in fact an invocation of his right to
counsel, and the totality-of-the-circumstances approach allows the juvenile
court the necessary flexibility to take this into account in determining
whether a juvenile has invoked his Fifth Amendment rights.  See id.








The cases relied upon by the State are distinguishable.  The State cites State v. Hyatt, 566
S.E.2d 61 (N.C. 2002), cert. denied, 537 U.S. 1133 (2003).  But in Hyatt, evidence at the
suppression hearing conclusively established that the defendant Awhispered@ to his
father that he wanted his father to get an attorney for him.  Id. at 70-71.  In Hyatt, both officers testified that
they did not hear the defendant ask his father to obtain an attorney, and the
trial court made a specific finding of fact that Aneither
Agent Shook nor Detective Benjamin heard defendant's alleged invocation of his
right to counsel.@  Id. 
Here, there is no question that Judge Bendslev heard H.V. state that he
wanted to call his mother, he wanted her to ask for a lawyer, he was only
sixteen.








The State also relies upon Fare.  442 U.S. at 719-20, 99 S. Ct. at
2569.  But in Fare, the juvenile
did not state that he wanted to call his mother because he wanted her to ask
for a lawyer; the juvenile said he wanted to call his probation officer.  Id. 
The United States Supreme Court held that the rule in Miranda is
based on the critical position lawyers occupy in our legal system because of a
lawyer=s unique
ability to protect the Fifth Amendment rights of a client undergoing custodial
interrogation.  Id.  Because of a lawyer=s
special ability to help the client preserve his Fifth Amendment rights once the
client becomes enmeshed in the adversary process, Athe
right to have counsel present at the interrogation is indispensable to the
protection of the Fifth Amendment privilege.@  Id. (quoting Miranda, 384 U.S.
at 469, 86 S. Ct. at 1625).  Here, H.V.
specifically indicated that he wanted to talk to his mother; he wanted her to
ask for a lawyer.  Through this request,
H.V. sought a lawyer=s unique ability and assistance,
not simply the assistance of his mother or a probation officer.     The State also cites Flamer v. Delaware,
68 F.3d 710, 725 (3d Cir. 1995), cert. denied, 516 U.S. 1088
(1996).  Flamer involved a
twenty-five-year-old adult suspect.  Id. at 719.  At his arraignment hearing, Flamer asked
permission to call his mother Ato
inquire about bail and possible representation by counsel.@  Id. at 725.  The Third Circuit held that Aa
request for an attorney at arraignment is, in itself, insufficient to invoke
the Fifth Amendment right to counsel at subsequent custodial interrogation.@  Id. at 726.  Here, H.V. did not request an attorney at
arraignment; he indicated that he wanted his mother to ask for an attorney
prior to custodial interrogation.








Because the trial court is the sole judge of the
credibility of the witnesses and the weight of their testimony, we hold that
the trial court's findings and conclusions are supported by the record.  Ross, 32 S.W.3d at 855.  Viewing the totality of the circumstances, we
hold that the trial court did not abuse its discretion in suppressing H.V.=s second written
statement when it properly determined that H.V.=s request to talk
to his mother because he wanted her to hire an attorney was a request for
counsel.  Compare R.D., 627 S.W.2d
at 805-07 (applying totality of the circumstances and holding that bare request
to talk to mother, without more, was not request for counsel).  We overrule the State=s first point.[12]

IV.  Suppression of Weapon

In his second statement, which the trial court suppressed,
H.V. explained that he Athrew the gun in the gutter close to [his]
house.@[13]  At the suppression hearing, Detective Carroll
indicated that, as a result of H.V.=s second
statement, police located the gun. 
During Detective Carroll=s questioning, he
said that H.V. told him that he took the gun and placed it in a sewer near his
house, that H.V. drew a diagram of the gun=s location, and
that police found the gun. 








In its second point, the State argues that even if H.V.=s second written
statement is suppressed, the trial court erred by suppressing the gun as the
alleged Afruit@ of H.V.=s second written
statement.  H.V. responds that the
violation of his Fifth Amendment right to counsel[14]
mandates the suppression of not only his second statement but also the
derivative evidence obtained from that statement. 








Once an accused in custody has requested the assistance of
an attorney, officers must terminate all interrogation until counsel is made
available or the accused voluntarily reinitiates communication.  See Minnick v. Mississippi, 498 U.S.
146, 153, 111 S. Ct. 486, 491 (1990); Edwards, 451 U.S. at 484‑85,
101 S. Ct. at 1885; Cross v. State, 144 S.W.3d 521, 526 (Tex. Crim. App.
2004).  An accused's request for an
attorney is per se an invocation of his Fifth Amendment rights, requiring that
all interrogation cease.  Edwards,
451 U.S. at 485, 101 S. Ct. at 1885; Fare, 442 U.S. at 719, 99 S. Ct. at
2569; Rhode Island v. Innis, 446 U.S. 291, 298, 100 S. Ct. 1682, 1688
(1980).  The presence of counsel insures
the process of police interrogation conforms to the dictates of the Fifth
Amendment privilege by insuring that an accused=s statements made
in a government‑established atmosphere are not the product of
compulsion.  Miranda, 384 U.S. at
466, 86 S. Ct. at 1623; see also Fare, 442 U.S. at 719, 99 S. Ct. at
2569.  Any statement taken after a person
invokes his Fifth Amendment privilege Acannot be other
than the product of compulsion, subtle or otherwise.@  Fare, 442 U.S. at 717, 99 S. Ct. at
2568 (quoting Miranda, 384 U.S. at 473-74, 86 S. Ct. at 1627-28).

Here, the trial court found that H.V. invoked his right to
counsel.  Deferring, as we must, to the
historical facts found by the trial court and not challenged by the State, we
have held that the trial court did not abuse its discretion by concluding that
H.V. invoked his Fifth Amendment right to counsel.  Consequently, all interrogation should have
ceased.  Edwards, 451 U.S. at 485,
101 S. Ct. at 1885; Fare, 442 U.S. at 719, 99 S. Ct. at 2569; Innis,
446 U.S. at 298, 100 S. Ct. at 1688. 
H.V.=s subsequent statement, Acannot be other
than the product of compulsion, subtle or otherwise.@  Fare, 442 U.S. at 717, 99 S. Ct. at
2568 (quoting Miranda, 384 U.S. at 473-74, 86 S. Ct. at 1627-28).  The magistrate=s failure to honor
H.V.=s invocation of
his right to counsel, placing him instead directly into a custodial
interrogation without counsel, operated to overcome H.V.=s free choice in
producing a statement.  See Miranda,
384 U.S. at 474, 86 S. Ct. 1628. The remaining question is whether our holdingCthat H.V.=s statement
disclosing the location of the gun was taken in violation of his invoked right
to the presence of counsel during custodial interrogationCmandates
suppression of the gun as determined by the trial court.








The State points out, and we agree, that the Afruit of the
poisonous tree@ doctrine articulated in Wong Sun[15]
does not apply to a mere failure to provide Miranda warnings to a
suspect prior to custodial interrogation when the suspect makes a voluntary
statement:  while the statement must be
suppressed, other evidence subsequently obtained as a result of that
accidentally unwarned statement, that is the Afruit@ of the statement,
need not be suppressed.  United States
v. Patane, 542 U.S. 630, 639, 124 S. Ct. 2620, 2628 (2004) (holding
accidental failure to give suspect Miranda warnings did not require
suppression of physical fruits of suspect=s unwarned but
voluntary statement); Oregon v. Elstad, 470 U.S. 298, 307, 105 S. Ct.
1285, 1292 (1985) (holding accidentally unwarned statements may be used to
impeach defendant=s testimony at trial); see also
Michigan v. Tucker, 417 U.S. 433, 452, 94 S. Ct. 2357, 2368 (1974); Baker
v. State, 956 S.W.2d 19, 22 (Tex. Crim. App. 1997); accord Marsh v.
State, 115 S.W.3d 709, 715 (Tex. App.CAustin 2003, no
pet.) (involving allegation of post-arrest interrogation before receiving Miranda
warnings); Montemayor v. State, 55 S.W.3d 78, 90 (Tex. App.CAustin 2001, pet. ref=d) (same).  Here, however, H.V.=s second statement
was not simply an unwarned statement; H.V. invoked his right to counsel before
he made his second statement.


















The State argues in its motion for rehearing that no
distinction exists between fruit from an accidently unwarned statement, like in
Patane,[16]
and fruit from a post failure-to-honor-a-request-for-counsel statement, like
H.V.=s here.  Stated another way, the State
contends that the disregard of a suspect=s
invocation of his right to counsel should not trigger the application of the
fruit-of-the-poisonous-tree doctrine because under Patane the accidental
failure to provide Miranda warnings does not.[17]  The Supreme Court of the United States has
not explicitly addressed the issue of whether fruits derivative of a voluntary,
post failure-to-honor-a-request-for-counsel statement are admissible in the
State=s
case-in-chief, but numerous state and federal courts have, and they are split
on the issue.[18]  See Patterson v. United States, 485
U.S. 922, 922, 108 S. Ct. 1093, 1094 (1988) (White and Brennan, JJ., dissenting
from denial of certiorari) (recognizing that the United States Supreme Court
had Aexpressly
left open the question of the admissibility of physical evidence obtained as a
result of an interrogation conducted contrary to the rules set forth in Miranda@ and
recognizing the split among the lower courts). 
Because,
as discussed below, in Elstad[19]
the Supreme Court recognized a distinction between the admissibility of fruit
from a custodial statement voluntarily made in the accidental absence of Miranda
warningsCwhich
does not involve a constitutional violationCand
fruit from a violation of an accused=s
constitutional rights, and because the Supreme Court in Dickerson v. United
States[20]
and in Missouri v. Siebert[21]
affirmed that Miranda set forth a constitutionally based rule, we hold
that such a distinction does exist and that fruits derivative of a voluntary,
post failure-to-honor-a-request-for-counsel statement are inadmissible in the
State=s
case-in-chief.  See also
Harris, 544 N.W.2d at 553 (holding Athere is
a critical difference between a mere defect in the administration of Miranda
warnings >without more= and
police‑initiated interrogation conducted after a suspect unambiguously
invokes the right to have counsel present during questioning); Mark S.
Bransdorfer, Note, Miranda Right‑to‑Counsel Violations and the
Fruit of the Poisonous Tree Doctrine, 62 Ind.
L.J. 1061, 1061, 1097 (1987) (explaining why Wong Sun=s fruit-of-the-poisonous-tree
doctrine should apply to Asecond generation derivative
evidence after an Edwards violation@).








We begin by examining the
fruit-of-the-poisonous-tree doctrine. 
Only evidence uncovered as a result of police infringement of a
constitutional right is Afruit of the poisonous tree@ because
the constitutional infringement creates a Apoisonous
tree,@ and the
evidence discovered as a result of the constitutional violation is the Afruit@ of that
violation.  Wong Sun, 371 U.S. at
485-86, 83 S. Ct. at 416 (recognizing policy underlying exclusionary rule is to
bar Aany use
of evidence unconstitutionally obtained@); see
also Nix v. Williams, 467 U.S. 431, 442-43, 104 S. Ct. 2501, 2508 (1984)
(purpose of fruit of poisonous tree doctrine is to "deter police from
violations of constitutional and statutory protections").  There is no constitutional right, however, to
receive Miranda warnings; that is, there is no constitutional right to
be warned of your constitutional rights. 
New York v. Quarles, 467 U.S. 649, 654, 104 S. Ct. 2626, 2630
(1984) (quoting Tucker, 417 U.S. at 444, 94 S. Ct. at 2364) (recognizing
that A[t]he
prophylactic Miranda warnings therefore are >not
themselves rights protected by the Constitution but [are] instead measures to
insure that the right against compulsory self‑incrimination [is]
protected=@).  Thus, because the accidental failure to give Miranda
warnings does not infringe upon an accused=s
constitutional rights, an accidental failure to warn does not create a Apoisonous
tree.@  See, e.g., Patane, 542 U.S. at 637,
124 S. Ct. at 2626 (holding Amere failures to
warn@ do not violate
the Constitution); Elstad, 470 U.S. at 304, 105 S. Ct. at
1290 (holding accidental failure to warn does not require suppression of second
warned statement); Tucker, 417 U.S. 433, 452, 94 S. Ct. 2357, 2368
(same).  In the absence of a Apoisonous
tree,@
physical Afruit@ from a
voluntary, accidentally unwarned statement need not be suppressed.  See Patane, 542 U.S. at
636-37, 124 S. Ct. at 2626; Elstad, 470 U.S. at 304, 105 S.
Ct. at 1290.








The Supreme Court, in Elstad, expressly
recognized this distinction.  In Elstad,
two officers visited eighteen-year-old Elstad=s home
to arrest him in connection with a robbery at a neighbor=s
home.  Elstad, 470 U.S. at
300-02,  304, 105 S. Ct. at 1288-90.  When one of the officers asked Elstad if he
knew a person by the neighbor=s name,
Elstad responded that he did and said that he had heard that there had been a
robbery at the neighbor=s home.  Id. at 301, 105 S. Ct. at
1288-89.  The officer stated his belief
that Elstad was involved, and Elstad responded, AYes, I
was there.@ 
Id.  Elstad was taken to
police headquarters where he was Mirandized, waived his rights, and gave
a confession.  Elstad argued that his
initial statement, AYes, I was there@ had to
be suppressed because he was not given his Miranda warnings before he
made this statement.  He also argued that
his second statement was the Afruit@ of the
first, unMirandized statement, so it also should be suppressed.  The Oregon Court of Appeals agreed and
suppressed the second, Mirandized statement.  The United States Supreme Court reversed,
explaining,

The Oregon court assumed
and respondent here contends that a failure to administer Miranda
warnings necessarily breeds the same consequences as police infringement of a
constitutional right, so that evidence uncovered following an unwarned
statement must be suppressed as Afruit of the poisonous tree.@ 

 








Id. at 303-04, 105 S. Ct. at 1290 (emphasis
added).  Thus, in Elstad, the
Supreme Court recognized a distinction in the admissibility of evidence
uncovered following police infringement of a constitutional right and the
admissibility of evidence uncovered following an accidentally unwarned
statement.[22]

We consequently come to the question of whether a
suspect=s
in-custody invocation of the right to counselCthat he
has just been advised he possessesCconstitutes
the invocation of a constitutional right. 
If a suspect=s invocation of his right to
counsel constitutes the invocation of a constitutional right, the
fruit-of-the-poisonous-tree doctrine is applicable.  Accord id. at 470 U.S. at 304, 105 S.
Ct. at 1290.  If a suspect has no
constitutional right to counsel during custodial interrogation, then the
fruit-of-the-poisonous-tree doctrine is inapplicable, and the State=s
position is correct.  Accord Patane,
542 U.S. at 636, 124 S. Ct. at 2625-26. 
Support for the proposition that the right to counsel during custodial
interrogation is a Fifth Amendment constitutional right is found in numerous
Supreme Court cases dealing with the right to counsel in the Fifth Amendment
context.

As discussed in connection with the State=s first
point, the Supreme Court has repeatedly emphasized the importance of the right
to counsel during custodial interrogation: 








The rule in Miranda . . . was based on
this Court's perception that the lawyer occupies a critical position in our
legal system because of his unique ability to protect the Fifth Amendment
rights of a client undergoing custodial interrogation.   Because of this special ability of the
lawyer to help the client preserve his Fifth Amendment rights once the client
becomes enmeshed in the adversary process, the Court found that 'the right
to have counsel present at the interrogation is indispensable to the protection
of the Fifth Amendment privilege under the system' established by the Court.

Fare, 442 U.S. at 719, 99 S. Ct. at 2568‑69
(emphasis added); see also Edwards, 451 U.S. at 484, 101 S. Ct. at
1884-85 (citing North Carolina v. Butler, 441 U.S. 369, 372-76, 99 S.
Ct. 1755, 1757-59 (1979)) (safeguarding invoked right to counsel by imposing
restrictions on subsequent waiver of that right).








Additional support for the constitutional nature of the
right to counsel during custodial interrogation is found in Dickerson.  530 U.S. at 440, 120 S. Ct. at 2334.  In Dickerson, the United States
Supreme Court affirmed that the Miranda Asystem
established by the Court,@ presumably including the right
to counsel during custodial interrogation, is founded upon the Fifth
Amendment.  Id. at 440, 120 S. Ct.
at 2334 nn. 5, 6 (holding Miranda is Aconstitutionally
based@ and
string citing multiple Supreme Court opinions). 
Because the Miranda rules are constitutionally based, the Dickerson
Court declared unconstitutional a statute that required courts to gauge a
confession=s admissibility based solely on
its voluntariness, without regard to compliance with Miranda.  Id. at 440, 120 S. Ct. at 2334.  The Dickerson Court held, AIn sum,
we conclude that Miranda announced a constitutional rule that Congress
may not supersede legislatively.@  Id. at 444, 120 S. Ct. at 2336.  We have no doubt that Dickerson
prohibits a legislature from not only a wholesale abandonment of Miranda=s
constitutional rule but also from a piecemeal abandonment of Miranda=s
constitutional rule, such as a legislative elimination of a suspect=s right
to counsel during custodial interrogation. 
Accord Edwards, 451 U.S. at 482, 101 S. Ct. at 1883 (stating that
Aan accused
has a Fifth and Fourteenth Amendment right to have counsel present during
custodial interrogation@).  Accordingly, because pursuant to Dickerson
it would appear that a legislature is without authority to eliminate an
accused=s right
to counsel during custodial interrogation, that right appears to be part and
parcel of Miranda=s Fifth Amendment constitutional
rule. 








Finally, still more support for the proposition
that the right to counsel during custodial interrogation is a Fifth Amendment
constitutional right is found in the Supreme Court=s recent
decision in Missouri v. Seibert. 
In Seibert, the Supreme Court addressed the admissibility of a
statement when the Miranda warnings that were given were rendered
totally ineffective.  542 U.S. at 604,
124 S. Ct. at 2605.  Officers in Rolla,
Missouri were trained to interrogate suspects in successive unwarned and warned
phases.  Id. at 609, 124 S. Ct. at
2608.  Officers intentionally withheld Miranda
warnings in the first, unwarned phase of the interrogation until a confession
was obtained.  Id.  Officers then provided Miranda
warnings and then covered the same ground again, thereby eliciting a
post-warning, purportedly admissible statement. 
Id. at 609-10, 124 S. Ct. at 2608-09.  Consequently, by the time the accused
received Miranda warnings, he had already confessed and had no real
choice concerning the invocation of his constitutional guarantees.  Id. at 611-12, 124 S. Ct. at
2609-10.  The Supreme Court held that,
under these circumstances, the second, warned statement must also be suppressed
because the warnings could not Afunction
effectively as Miranda requires.@  Id. at 611-12, 124 S. Ct. at 2610.

Likewise, the Aindispensable@ right to counsel
during custodial interrogation cannot function effectively as Miranda
requires if the police are free to ignore an accused=s invocation of
his right to counsel in hopes of obtaining physical evidence that will be
admissible against the accused.  Counsel
cannot exercise his unique ability to protect the Fifth Amendment rights of a
client undergoing custodial interrogation if the custodial interrogation is
completed in his absence.  As
explained by the Supreme Court of Wisconsin, 








The rule argued for by the State [no suppression of fruits derivative
of post failure-to-honor-a-request-for-counsel statement] would minimize the
seriousness of the police misconduct producing the evidentiary fruits, breed
contempt for the law, and encourage the type of conduct that Miranda was
designed to prevent.[23]

 

. . .
.

 

Regarding minimizing the seriousness of police
misconduct and breeding contempt for the law, Professor Yale Kamisar has
written:      

 

Consider, for example, a
situation where the suspect has invoked his right to counsel, but the police
continue to question him in order to retrieve the murder weapon or some other
nontestimonial evidence.  In this set of
circumstances[,] the police have nothing to lose by rejecting the request for
counsel (they will lose any statement the suspect might make, but they would
have lost any statement anyway if they had honored the suspect's request for
counsel and immediately ceased all questioning) and something to gain (the use
of physical evidence that the inadmissible statement might turn up). 

 

Knapp, 700 N.W.2d at 918-19 (quoting Yale Kamisar, Postscript:  Another Look at Patane and Seibert, the 2004
Miranda "Poisoned Fruit" Cases, 2 Ohio St. J. Crim. L. 97, 105 (2004)).  








Seibert instructs that strategists cannot drain the substance
out of Miranda by providing ineffective warnings that cannot
serve their intended purposes.  542
U.S. at 617, 124 S. Ct. at 2613.  The
whole purpose of Miranda was to Agive
concrete constitutional guidelines for law enforcement agencies and courts to
follow.@  Dickerson, 530 U.S. at 439, 120 S. Ct.
at 2334 (quoting Miranda, 384 U.S. at 441-42, 86 S. Ct. at 1602). The
concrete constitutional guidelines require that interrogation cease when an
accused unambiguously invokes his right to counsel.  See, e.g., Minnick, 498 U.S. at 153,
111 S. Ct. at 491; Edwards, 451 U.S. at 484‑85, 101 S. Ct. at
1885; Cross, 144 S.W.3d at 526.  To
nonetheless hold that, if interrogation does not cease, fruits from the post
invocation-of-the-right-to-counsel statement are admissible would impermissibly
erode Miranda=s concrete constitutional
guidelines and drain all substance from the purported right to counsel during
custodial interrogation.  For these
reasons, we hold that the right to counsel during custodial interrogation is a
constitutional, Fifth Amendment right.[24]








As we previously discussed, H.V. was detained for
approximately three hoursCfrom 4:30 p.m. to 7:30 p.m.Cbefore
he was given Miranda warnings.  As
we have held, and the trial court found, H.V. invoked his right to counsel when
he was informed of that right by Judge Bendslev.  Nonetheless, Judge Bendslev turned H.V. over
to police for interrogation and, from shortly after 7:30 p.m. until 10:35 p.m.,
police interrogated H.V. in the absence of counsel.  After more than two hours of custodial
interrogation, Detective Carroll began typing H.V.=s
statement.  The custodial interrogation
of H.V. despite H.V.=s invocation of his right to
counsel infringed upon H.V.=s
constitutional Fifth Amendment right to counsel.  See Edwards, 451 U.S. at 481-82, 101
S. Ct. at 1883-84 (recognizing that Fifth Amendment right to counsel attaches
during custodial interrogation).  After
H.V. incriminated himself in his second statement and therein disclosed the
location of the gun, police concluded their interrogation and H.V.=s Fifth
Amendment right to have counsel present during that completed interrogation was
forever lost.  This
constitutional violation of H.V.=s Fifth Amendment
right to counsel created a Apoisonous tree.@  The evidence discovered as a
result of this constitutional violationCthe gunCis the Afruit@ of that
violation and must be suppressed, at least in the State=s
case-in-chief.  See Hass,
420 U.S. at 722-24, 95 S. Ct. at 1220-21; Wong Sun, 371 U.S. at 485-86,
83 S. Ct. at 416.  








We realize that we are to maintain the Aclosest
possible fit . . . between the Self-Incrimination Clause and any judge-made
rule designed to protect it.@  Patane, 542 U.S. at 643, 124 S. Ct. at
2629-30.  Here,
the Afit@ between H.V.=s invocation of
his Fifth Amendment right to counsel and the trial court=s suppression of
the gunCthe judge-made
rulingCis a proper, close
Afit.@  The Fifth Amendment right to counsel is
protected only by an exclusionary rule that requires suppression of the
physical fruits located as a result of information provided in a post
failure-to-honor-a-request-for-counsel statement; otherwise, the Fifth
Amendment right to counsel would truly exist only when interrogators decided to
honor a suspect=s request for counsel.[25]  For these reasons, we hold that the trial
court did not abuse its discretion by granting H.V.=s motion to
suppress the gun located by police as a result of his second statement.  Accord Tex. Fam. Code Ann. ' 54.03(e) (Vernon
Supp. 2005) (stating that evidence illegally seized or obtained is inadmissible
in an adjudication hearing).[26]








Nor was evidence introduced at the suppression hearing that
the gun would have been,[27]
or was, discovered by means sufficiently distinguishable to be purged of the
violation of H.V.=s Fifth Amendment privilege.  Compare Thornton v. State, 145
S.W.3d 228, 233-34 (Tex. Crim. App. 2004) (holding sufficient attenuating
factors existed dissipating taint of illegal arrest from derivative evidence
obtained as a result of arrest).  We
overrule the State=s second point.[28]

V. 
Conclusion

Having overruled
all of the State=s points, we affirm the trial court=s order suppressing H.V.=s second written statement and the
gun obtained as a result of that statement.

 

 

 

SUE WALKER

JUSTICE

 

PANEL B:    HOLMAN, WALKER, and MCCOY, JJ.

 

DELIVERED: November 17, 2005

 











[1]H.V. also requested that
the trial court suppress his first written statement given on the morning of
September 12, 2003, all evidence listed in the search warrant return (i.e.,
swabs, carpet, couch sample, carpet tack, shower curtain and rod, door handle,
spray bottle, rag, t-shirt, towels, lint from dryer, shorts, briefs, plastic
cover, cell phone, carpet sample from 1999 Honda Accord, seat sample from 1999
Honda Accord, camera from 1999 Honda Accord, 2 HP computers, blue trash bin,
and brown trash bin), any evidence seized from his computer pursuant to the
search warrant, and his spontaneous statements made while under arrest the
afternoon of September 12, 2003.  The
trial court denied H.V.=s motion to suppress his
first written statement, the evidence seized pursuant to the search warrants,
the spontaneous statements H.V. made at the patrol car, and any statement H.V.
made without being warned of his rights under the Vienna Convention.  These rulings are not at issue here.





[2]During the week following
the initial investigation, the police spoke to 
witnesses who saw H.V. purchase the gun. 





[3]Miranda v. Arizona, 384 U.S. 436, 86 S. Ct.
1602 (1966).





[4]Detective Johnson
requested Officer Petrovic=s presence because she knew that H.V. had moved
to the United States from Bosnia when he was in the fifth grade and suspected
that she might need a translator when speaking with H.V.=s parents.





[5]H.V. made a phone call
after Detective Johnson returned him to the school, and then he left campus.





[6]Officers did not see H.V.
enter the house; the off-duty officer spotted him as he was leaving the
residence.





[7]The trial court did not
suppress this statement. 

 





[8]Although the defendant
carries the burden of unequivocally asserting his right to counsel, see
Davis, 512 U.S. at 461‑62, 114 S. Ct. at 2356‑57, the State has
the burden of establishing by a preponderance of the evidence that the defendant
subsequently voluntarily waived his right to counsel.  Moran v. Burbine, 475 U.S. 412, 421,
106 S. Ct. 1135, 1140‑41 (1986) (holding State is required to establish
alleged waiver Amade with a full
awareness of both the nature of the right being abandoned and the consequences
of the decision to abandon it@).  The
State challenges only the trial court=s finding that H.V. unambiguously invoked his
right to counsel; it does not claim that, after invoking the right to counsel,
H.V. subsequently waived that right.





[9]In this opinion, we use the
term Avoluntary@ or Avoluntarily@ to describe statements
made as the result of custodial interrogation when the defendant makes no claim
that his statement was actually coerced or involuntary.  See, e.g.,  Harris v. New York, 401 U.S. 222, 224, 91
S. Ct. 643, 645 (1971) (noting that A[p]etitioner makes no claim that the statements
made to the police were coerced or involuntary@).





[10]The State points to H.V.=s initial contact with
the magistrate judge on the morning of September 12, 2003 to show that he was
familiar with the magistrate warning process. 
The trial court as sole trier of the facts and judge of the credibility
of the witnesses, however, was free to determine the weight to be accorded this
fact in light of the totality of the circumstances.  See Ross, 32 S.W.3d at 855.





[11]The trial court heard the
witnesses, including Judge Bendslev, testify and the trial court interpreted
H.V.=s statement that he was
only sixteen as meaning Athat he did not know how
to ask for an attorney.@  See Finding of Fact Number 4.





[12]The State does not challenge
on appeal the trial court=s ruling that H.V.=s second written
statement is inadmissible Aat trial,@ or argue that H.V.=s statement, although
inadmissible during the State=s case-in-chief, may become admissible for
impeachment purposes.  Consequently, we
do not address this issue.





[13]In H.V.=s first statement, which
was not suppressed, he admitted purchasing a gun from a friend and identified
the individuals present when he purchased it as well as the individuals to whom
he subsequently showed the gun.  In this
first statement, H.V. claimed that he returned the gun to the seller because he
decided he did not want it.





[14]The Sixth Amendment right
to counsel does not attach until a prosecution is commenced, that is, Aat or after the
initiation of adversary judicial proceedings against the defendant.@  Green v. State, 934 S.W.2d 92, 97
(Tex. Crim. App. 1996) (quoting United States v. Gouveia, 467 U.S. 180,
187, 104 S. Ct. 2292, 2297 (1984)), cert. denied, 520 U.S. 1200
(1997).  In this case, no charges had
been brought against H.V. prior to the custodial interrogation at issue.  Accordingly, we analyze the issue under the
Fifth Amendment.





[15]Wong Sun v. United States, 371 U.S. 471, 83 S. Ct.
407 (1963).





[16]Patane, 542 U.S. at 636, 124 S. Ct. at
2625-26.





[17]The State relies heavily
on Oregon v. Hass for this proposition. 
420 U.S. at 722-24, 95 S. Ct. at 1220-21.  But in Hass, the defendant=s post
failure-to-honor-a-request-for-counsel statement was suppressed and, likewise,
the fruit of that statementCthe defendant=s pointing out the location of the stolen
bicycle, was also suppressed.  Id.  The issue was whether the statement and its
fruit were admissible as impeachment evidence.  Id.  Thus,
we do not read Hass as supporting the State=s argument that the gun
in this case should not be suppressed in the State=s case-in-chief. 





[18]See, e.g., Boles v. Foltz,
816 F.2d 1132, 1135 (6th Cir.) (holding derivative evidence obtained through
custodial interrogation following invocation of right to counsel inadmissible),
cert. denied, 484 U.S. 857 (1987); United States v. Downing, 665
F.2d 404, 407-10 (1st Cir. 1981) (same); United States ex rel. Hudson v.
Cannon, 529 F.2d 890, 892-93 (7th Cir. 1976) (same); United States v.
Massey, 437 F. Supp. 843, 855-61 (M.D. Fla. 1977) (same); Commonwealth
v. White, 371 N.E.2d 777, 780‑ 81 (Mass. 1977), aff'd by an
equally divided court, 439 U.S. 280 (1978) (same); State v. Harris, 544
N.W.2d 545, 553 (Wis. 1996) (same); see also State v. Gravel, 601 A.2d
678, 682-86 (N.H. 1991) (imposing bright-line state constitutional rule
excluding all fruits from all statements taken in violation of Miranda);
State v. Knapp, 700 N.W.2d 899, 921 (Wis. 2005) (holding fruit derived from
voluntary post failure-to-honor-a-request-for-counsel statement inadmissible
under state constitution).  Accord
Calif. Attys for Criminal Justice v. Butts, 195 F.3d 1039, 1045-47 (9th
Cir.) (op. on reh=g) (recognizing
constitutional dimension of Fifth Amendment right to counsel), cert. denied,
530 U.S. 1261 (2000).  But see Taylor
v. State, 553 S.E.2d 598, 604-05 (Ga. 2001) (holding derivative evidence
from voluntary, post failure-to-honor-invocation-of-right-to-counsel statement
admissible in State=s case-in-chief);
State v. Goodman, 600 S.E.2d 28, 30 (N.C. 2004) (same); United States ex
rel. Winsett v. Washington, 860 F. Supp. 479, 483-85 (N.D. Ill. 1994)
(same).

 





[19]470 U.S. at 307, 105 S. Ct. at
1292.





[20]530 U.S. 428, 437, 120 S.
Ct. 2326, 2333 (2000). 





[21]542 U.S. 600, 124 S. Ct.
2601 (2004).





[22]The Supreme Court
expressly recognized that Elstad had Asuffered no identifiable constitutional harm.@  Id. at 307, 105 S. Ct. at 1292.





[23]In Knapp, police
obtained a blood-stained sweatshirt as the Afruit@ of Knapp=s post invocation-of-the-right-to-counsel
statement.  In Knapp, as here, no
allegations existed that Knapp=s statement was involuntary under the traditional
voluntariness standards.  700 N.W.2d at
899-902.





[24]We recognize that in
1997, before the United States Supreme Court wrote in Dickerson and Seibert
that Miranda is a constitutional rule, the Texas Court of Criminal
Appeals in Baker held that neither a suspect=s consent to search given
after the police failed to honor his request for counsel nor the items found in
the search need be suppressed as fruits of the poisonous tree.  Baker, 956 S.W.2d at 23 (citing Elstad
and Tucker, which Patterson declared had left the issue
undecided).  We are, however, bound by
the United States Supreme Court=s more recent decisions in Dickerson and Seibert.





[25]We note that this is not
a case like People v. Bradford, 929 P.2d 544, 565 (Cal.), cert.
denied, 522 U.S. 953 (1997), cited by the State, where, after invoking his
right to counsel, the defendant himself later initiated subsequent
questioning.  H.V.=s custodial interrogation
followed immediately on the heels of his invocation of his right to counsel.





[26]In a supplemental letter
brief, the State argues that Swain v. State, No. AP-74854, 2005 WL
2861584, at *3-6 (Tex. Crim. App. Nov. 2, 2005) holds that  the gun in this case need not be
suppressed.  We cannot agree.  Swain simply held that the appellant
failed to preserve any alleged violation of his Fifth Amendment right to
counsel as a ground for suppression.  Id.
at *6.





[27]Texas does not recognize
the inevitable discovery doctrine.  State v. Daugherty, 931 S.W.2d 268, 269
(Tex. Crim. App. 1996); see also Roquemore v. State, 60 S.W.3d 862, 870
n.12 (Tex. Crim. App. 2001) (same).





[28]In its third point, the
State contends that the violation of Texas Family Code section 52.02 found by
the trial court does not provide a basis for suppressing H.V.=s statement or the fruit
of that statement.  Because we have
upheld the trial court=s suppression rulings as
set forth above, we need not address this argument.  See Tex.
R. App. P. 47.1.